# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**STEVEN E. RIPSTRA**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana



FILED
Apr 04 2013, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| STERLEN SHANE KELLER, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )  No. 59A01-1206-CR-271 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE ORANGE CIRCUIT COURT
The Honorable Larry R. Blanton, Judge
Cause No. 59C01-1010-MR-108

**April 4, 2013**

**OPINION – FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Sterlen Keller appeals his convictions and sentence for Class D felony auto theft, Class B felony burglary, nine counts of Class D felony theft, and Class A misdemeanor failure to report a dead body.  We affirm in part, reverse in part, and remand.

## Issues

Keller raises six issues, which we reorder and restate as:

I.    whether the trial court properly allowed the State to amend the charging information;

II.   whether he was denied his right to a speedy trial;

III.  whether his statements to police were properly admitted into evidence;

IV.   whether the jury was properly instructed;

V.    whether there is sufficient evidence to support his convictions;

VI.   whether his theft convictions violate the single larceny rule or the continuing crime doctrine; and

VII.  whether he was properly sentenced.

## Facts

Seventy-nine-year-old Robert Collier lived alone on his farm in Orange County.  In the spring of 2010, twenty-two-year-old Keller approached Collier about selling his old farm equipment for scrap.  Collier initially declined Keller's offer.

In October 2010, Keller's step-father, Joseph Howell, became suspicious when Keller began driving a GMC truck.  Howell contacted someone from the Washington County Sheriff's Department, and it was eventually discovered that the truck was

2

registered to Collier. On October 9, 2011, the Orange County Sheriff's Department conducted a welfare check on Collier and discovered Collier's body near some outbuildings on Collier's property. Based on the "[m]assive decomposition with mummification," it was clear that Collier's body had been there for some time. Ex. 230.

From August 25, 2010, through October 4, 2010, Keller sold items to Partins Salvage ("Partins") on fourteen occasions. Among these transactions, police discovered that Keller had sold an Oldsmobile on August 30, 2010, a farm truck on September 15, 2010, and a tractor on September 21, 2010. These vehicles were later identified as Collier's. A ring identified as Collier's was found in the ashtray of the Oldsmobile. In Keller's garage, police found another ring, which was identified as Collier's, a Social Security check made out to Collier, a box of Collier's blank personal checks, uncashed Edward Jones checks made out to Collier, and pieces of Collier's mail. A rifle, later identified as Collier's, was found in Keller's residence.

On September 28, 2010, three of Collier's Edward Jones checks were cashed. Stubs associated with these checks were found in Keller's garage. On October 7, 2010, one of Collier's personal checks was used to make a past due payment on Keller's fiancée's account at Jackson County REMC for a house Keller owned. On October 8, 2010, two of Collier's personal checks totaling $1,150.00 and made out to Keller were cashed.

On October 9, 2010, and October 11, 2010, police questioned Keller about Collier. Keller indicated that, although Collier initially declined Keller's offer to buy junk from him, Collier later contacted Keller, and Collier agreed to allow Keller to sell farm

3

equipment and other items for scrap. According to Keller, he initially paid Collier outright for the items, and they later agreed to a 60/40 split of the proceeds. Although Keller initially denied any wrongdoing, he eventually admitted that he had found Collier dead on the property around August 23, 2010, and after the discovery he took Collier's GMC truck and mail from Collier's mailbox on two occasions.

On October 12, 2010, the State charged Keller with murder, Class D felony auto theft, and Class A misdemeanor failure to report a dead body. On December 12, 2011, Keller moved to suppress his statements to police. After a hearing, the trial court denied the motion to suppress.

A jury trial was scheduled for February 21, 2012, and, on February 9, 2012, the State moved to amend the charging information to include, in addition to the three original charges, one count of Class B felony burglary and nine counts of Class D felony theft. The amended information contained the following allegations, Count 1, murder; Count 2, Class D felony auto theft of the GMC truck; Count 3, Class B felony burglary; Count 4, Class D felony theft of the Social Security check; Count 5, Class D felony theft of the Edward Jones checks; Count 6, Class D felony theft of the personal checks; Count 7, Class D felony theft of the ring found in Keller's garage; Count 8, Class D felony theft of the ring found in the ashtray of the Oldsmobile; Count 9, Class D felony theft of the rifle; Count 10, Class D felony theft of the tractor; Count 11, Class D felony theft of the Oldsmobile; Count 12, Class D felony theft of the farm truck; and Count 13, Class A misdemeanor failure to report a dead body.

4

Keller objected to the amendment and, on February 17, 2012, after a hearing, the trial court denied the amendment because adding the charges so close to trial was a surprise that prejudiced Keller's preparation of a defense. On February 21, 2012, the State moved for a continuance so that it could file the additional charges, which the State would be barred from pursuing at a later time. At a hearing that same day, Keller objected to the continuance and the prospective amendment. The trial court granted the continuance, allowed the State five days to refile the amended information, and rescheduled the trial for April 17, 2012. At the conclusion of the hearing, Keller filed a motion for early trial pursuant to Indiana Criminal Rule 4(B). On February 24, 2012, the State refiled the amended information. Keller again objected to the amendment and, after a hearing on April 5, 2012, the trial court overruled the objection.

An eight-day jury trial began on April 17, 2012. At the conclusion of the trial, the jury found Keller not guilty of murder and guilty of the remaining charges. On May 22, 2012, a sentencing hearing was held. The trial court found as mitigating Keller's age, the hardship on his family, his acceptance of responsibility, and his low risk of reoffending. The trial court found as aggravating Collier's age, Collier's physical disability, Keller's criminal history and pattern of dishonesty, and the fact that, after Keller discovered Collier's body, he did not report the body and repeatedly returned to commit additional crimes. The trial court sentenced Keller as follows: auto theft, three years; burglary, fifteen years, with eight executed and seven suspended; theft of the Social Security check and the Edward Jones checks, two years each; theft of the personal checks, one and a half years; theft of the two rings and rifle, one and a half years each; theft of the tractor, the

5

Oldsmobile, and the farm truck, three years each; and failure to report a dead body, one year. The trial court ordered the sentence for the theft of the personal checks to run concurrent with the auto theft charge and the sentences for the theft of the rings and the rifle to run concurrent with the burglary charge. The trial court ordered the remaining sentences to be served consecutively for a total sentence of thirty-two years, with twenty-five years executed and seven years suspended. Keller now appeals.

**Analysis**

*I. Amendment*

Keller argues that the trial court abused its discretion by permitting the State to amend the charging information. Keller acknowledges that generally a defendant's failure to request a continuance after a trial court allows a pre-trial substantive amendment to the charging information results in waiver. See Wilson v. State, 931 N.E.2d 914, 918 (Ind. Ct. App. 2010), trans. denied. Keller claims that he should not be held to have waived his right to appeal this issue because he had filed an early trial motion, because the second amended information was identical to the first, which the trial court had previously rejected, because the trial court charged him for the delay, and because the State filed the amended charges less than two weeks prior to trial.[1]

The record does not support these assertions. On February 9, 2012, shortly before the trial was scheduled to begin, the State sought to amend the charging information to include the burglary and theft charges. Keller objected and, on February 17, 2012, the

---

[1] This argument appears to be based on the trial court's April 5, 2012 ruling. However, Keller was on notice of the State's intent to file the additional charges at least as of February 9, 2012, and certainly Keller was aware of the trial court's rationale when the new charges were refiled on February 24, 2012.

trial court denied the amendment because the late filing was prejudicial to Keller's ability to prepare a defense. On February 21, 2012, the State moved for a continuance so that it could refile the additional charges. Keller objected to the continuance and asserted his right to an early trial. At a hearing that same day, the trial court acknowledged that all of the previous continuances had been requested either by Keller alone or by Keller and the State jointly. The parties also discussed whether the State would be statutorily barred from pursuing the additional charges later. The trial court concluded that the continuance remedied any surprise and allowed Keller time to prepare a defense. The trial court granted the State five days to refile the charges, which it did on February 24, 2012, and rescheduled the trial for April 17, 2012. On March 5, 2012, Keller again objected to the State's filling of the amended information and, on April 5, 2012, the trial court overruled the objection.

Quite simply, not only did Keller fail to request a continuance, he objected to the State's motion for a continuance. See Tr. p. 206. We are not convinced that Keller's March 5, 2012 objection or his early trial motion are sufficient to avoid the waiver of this issue.

Waiver notwithstanding, Keller's argument that the new charges were amendments of substance appears to be based on case law interpreting a prior version of the amendment statute. See Ind. Code § 35-34-1-5 (1993); Fajardo v. State; 859 N.E.2d 1201 (Ind. 2007); Fuller v. State, 875 N.E.2d 326 (Ind. Ct. App. 2007), trans. denied. As Keller also recognizes, Indiana Code Section 35-34-1-5 was amended in 2007 in response to Fajardo "to again permit amendments of substance at any time before the

7

commencement of trial so long as the amendment does not prejudice the substantial rights of the defendant." Wilson, 931 N.E.2d at 918; see also I.C. § 35-34-1-5(b)(2) (allowing amendments of substance prior to the commencement of trial "if the amendment does not prejudice the substantial rights of the defendant.").

Although Keller asserts that the State possessed the evidence supporting the additional charges long before it filed the amendment, he does not explain how the continuance and the amendment prejudiced his substantial rights. In fact, the trial court clearly was concerned about the prejudice to Keller's substantial rights when it first denied the State's motion to amend the information. The trial court later explained, however, that the continuance alleviated its concerns of prejudice because it allowed Keller time to prepare a defense to the new charges. Without more, Keller has not shown that the trial court abused its discretion in granting a continuance and allowing the State to amend the information.

## *II. Right to a Speedy Trial*

On February 21, 2012, citing Indiana Criminal Rule 4(B), Keller moved for an early trial. "Indiana Criminal Rule 4 generally implements the constitutional right of an accused to a speedy trial." Cundiff v. State, 967 N.E.2d 1026, 1027 (Ind. 2012). As the Cundiff court noted, however, "Criminal Rule 4 does not cover every aspect of the constitutional right to a speedy trial." Id. at 1027 n.2. An accused "has two distinct but related rights to have the processes of justice move deliberately toward the end of obtaining a trial within a reasonable and agreeable time—one right is guaranteed by the Constitutions and one by the implementing CR. 4." State v. Moles, 166 Ind. App. 632,

8

647, 337 N.E.2d 543, 552 (1975). "A violation of CR. 4 is per se a violation of the accused's constitutional right to a speedy trial." Id.

Criminal Rule 4(B)(1) generally requires that a defendant be discharged if not brought to trial within seventy days from the date of an early trial motion. Although Keller devotes a substantial part of his brief to Criminal Rule 4, he also acknowledges that, because the trial began fifty-six days after he filed his motion, this rule was not violated. Keller has not shown a per se violation of his right to a speedy trial under Criminal Rule 4(B).

On appeal, Keller also asserts that his constitutional right to a speedy trial was violated. Assuming the constitutional issue is properly preserved,[2] the right of an accused to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution, and Article 1, Section 12 of the Indiana Constitution. McCloud v. State, 959 N.E.2d 879, 886 (Ind. Ct. App. 2011), trans. denied. In reviewing whether a defendant has been denied a speedy trial under the 6th Amendment, we apply the analysis established in Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972), which requires the balancing of four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) any resulting prejudice to the defendant. Id. None of the four factors is regarded as a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Barker, 407 U.S. at 533, 92 S. Ct. at 2193. "Rather, they are related factors and must be considered together with such

---

[2] At the February 21, 2012 hearing, Keller generally referenced his constitutional right to be brought to trial in a timely manner. See Tr. p. 211.

9

other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." Id., 92 S. Ct. at 2193.

Keller appears to take issue with the delay from February 21, 2012, until April 17, 2012, as it relates to the State's amendment of the information. However, because Keller does not provide us with a specific argument based on the four Barker factors, this argument is waived. See Wingate v. State, 900 N.E.2d 468, 475 (Ind. Ct. App. 2009) (concluding that the issue was waived where the defendant summarized the rules but did not make a cogent argument regarding the application of the rules); Ind. Appellate Rule 46(A)(8)(a) (requiring each of the appellant's contentions to be supported by cogent reasoning and citation to the authorities, statutes, and parts of the appendix or record relied on).

Waiver notwithstanding, the length of the delay from October 12, 2010, when the original charges were filed, to the April 17, 2012 trial was not excessive given the seriousness of the murder charge. Further, of the three initial continuances, Keller sought one and jointly sought the other two. As for the reason for the delay, although the State moved for the February 21, 2012 continuance and Keller objected to it, the purpose of it was to allow Keller time to prepare a defense to the burglary and theft charges the State sought to bring against Keller because successive prosecution of those charges would have been statutorily barred. Regarding the assertion of his right to a speedy trial, Keller did not assert his right to a speedy trial until February 21, 2012, and had agreed to all of the continuances prior to that date. As for the resulting prejudice, we see none. In fact,

10

the less than two-month delay was intended to provide him with the opportunity to prepare a defense against the theft and burglary charges. Under the totality of the circumstances, we are not convinced the eighteen-month delay in bringing Keller to trial deprived him of his constitutional right to a speedy trial.

### III. Keller's Statements to Police

Keller argues that the trial court improperly admitted into evidence his October 9, 2010 and October 11, 2010 statements to police because they were taken in violation of his Miranda rights. "Our standard of review of rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by trial objection: we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling." Jackson v. State, 890 N.E.2d 11, 15 (Ind. Ct. App. 2008). "However, we must also consider the uncontested evidence favorable to the defendant." Id.

### A. October 9, 2010 Statement

The U.S. Supreme Court has held:

> when law enforcement officers question a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way," the person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

Luna v. State, 788 N.E.2d 832, 833 (Ind. 2003) (quoting Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966)). In determining whether a person was in custody, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of

11

movement of the degree associated with a formal arrest.  Id.  We consider whether a reasonable person in similar circumstances would believe he or she is not free to leave. Id.

Keller argues that he was in custody without having been Mirandized during the initial part of the interview.[3]  In support of this argument, Keller relies on the testimony of one of the interviewing officers, Detective David Henderson of the Indiana State Police, who testified at the suppression hearing that they were going to detain Keller based on their concern that the truck was stolen.  Even if Detective Henderson intended to detain Keller, "the question of custody is an objective test based upon how a reasonable person in the suspect's shoes would understand the situation and not upon the subjective views or beliefs of the interrogating officers and suspect."  Bean v. State, 973 N.E.2d 35, 40 (Ind. Ct. App. 2012), trans. denied.  There is no indication that Detective Henderson conveyed his intentions to Keller.  Further, Keller voluntarily went to the Washington County Jail with his stepfather.  Keller was taken to a room in the administrative part of the jail, the door was not locked, and he was not handcuffed.  The interview lasted thirty-eight minutes.  At the beginning of the interview, Keller was told that he was not under arrest, that he was free to go, and that he could get up and go at any time.  Based on the totality of the circumstances, a reasonable person in similar circumstances would believe he or she was free to leave.  Thus, Keller was not in custody when he gave the un-Mirandized statement to police.

---

[3]  Before Keller was Mirandized, Keller stated that he bought the GMC truck from Collier in early-August, that he stopped by Collier's house in February and tried to buy junk from him, but Collier declined, and that he visited Collier every once in a while.

12

## B. October 11, 2010 Statement

At the conclusion of the October 9, 2010 statement, Keller was formally arrested and transferred to the Orange County Jail.  On October 11, 2010, he was again questioned by police.  There is no dispute that Keller had been Mirandized when he gave this statement.  He argues, however, that he was improperly questioned after he invoked his right to remain silent.  "An assertion of the <u>Miranda</u> right to remain silent must be clear and unequivocal."  <u>Wilkes v. State</u>, 917 N.E.2d 675, 682 (Ind. 2009), <u>cert. denied</u>, 131 S. Ct. 414.  In determining whether a defendant has asserted this right, we consider the statements as whole, and mere expressions of reluctance to talk do not invoke the right to remain silent.  <u>Id.</u>  Our supreme court has held several times that raising doubts or expressing concern about continuing an interview followed by continued dialogue does not unambiguously assert the right to remain silent.  <u>Id.</u>

Keller was questioned by Detective Rick Magill of the Indiana State Police and Detective Henderson.  During the interview, the following exchange took place:

> [Magill]:  Your story just keeps gettin' more farfetched at this point.
>
> [Keller]:  Well I mean I would. . . . .
>
> [Magill]:  We want the truck, Sterlen, but. . . .
>
> [Keller]:  . . . .and I don't want to talk to you no more then.
>
> [Magill]:  Okay.
>
> [Keller]:  I aint, cause you're just gonna keep sayin' this stuff?

13

[Magill]:     Well. . . .

[Keller]:     And make it. . . .

[Magill]:     . . .what am I keep saying?  You. . . . .

[Keller]:     I'm farfetched.  You want the truth.  I've told you, buddy.

[Magill]:     Yeah, but. . . .

[Keller]:     I mean I'm sorry.

[Magill]:     I'm not the one. . . .

[Keller]:     I'm not tellin' you exactly want you want to hear.

[Henderson]: I don't want you to tell. . . .

[Keller]:     I'm sorry. . . .

[Henderson]: . . . .me anything but the truth, Sterlen.

[Magill]:     That's. . . .

[Keller]:     Yeah.

[Magill]:     . . . .that's what I want too.

[Henderson]: I don't want nothing but the truth.

[Keller]:     And I'm sorry that, you know, what I've told you is not believin'.

[Henderson]: That's fine.

[Keller]:     I mean. . . .

[Magill]:     . . . . you said you were bein' honest.

[Keller]:     Yeah, and. . . .

14

> [Magill]: And you didn't tell me about the mail until I. . . .
>
> [Keller]: The mail, yeah.

Tr. pp. 609-610. Detective Magill pointed out that Keller had not been truthful in his earlier statements and the interview continued. Later, the following exchange took place:

> [Keller]: I'm tellin' you, I'd, I mean I don't know what happened to the old man. I didn't touch him. . . .
>
> [Henderson]: Did he die right there in front of you?
>
> [Keller]: I didn't see him die. I didn't watch him die. I seen him dead. Now where Marvin gets he was alive and we was, I don't know. I really don't. But I'm tellin' you what I seen. I'm, you know, I have nothing else to say.
>
> [Henderson]: That's fine, then, you know, I'm not being mean to you.
>
> [Keller]: Oh, I know you're not.
>
> [Henderson]: What I'm sayin' is. . . .
>
> [Keller]: I ain't tryin' to sound like. . . .
>
> [Henderson]: . . . .man. I'm getting two, two way off stories, you know, and I'm, I've been with you now two times and I know your th', your wife, girlfriend, you know, she's a good kid. I don't care, you know, any, whatever goes on, but she is a good girl.

Id. at 616. The interview continued, and Keller eventually admitted to seeing Collier hours before he died and shortly after he died, to stealing the GMC truck, and to taking mail from Collier's mailbox on two occasions.

15

Although Keller was frustrated that the officers did not believe his version of events and indicated that he was not going to tell them another version, he continued conversing with them. At no point did he unequivocally assert his right to remain silent. See Wilkes, 917 N.E.2d at 683 (concluding that the evidence supported the conclusion that Wilkes did not unequivocally assert his right to remain silent where, after each of Wilkes's purported attempts to end the interrogation, he continued to speak with the detective). Keller has not established that the trial court abused its discretion in admitting his statements to police into evidence.

### IV. Jury Instructions

### A. Conversion Instruction

Keller requested that the jury be instructed on conversion as a lesser included offense of theft.

> When asked to instruct the jury on a lesser included offense, a trial court must determine whether the offense is inherently or factually included in the charged offense and, if so, whether there is a serious evidentiary dispute regarding any element that distinguishes the greater offense from the lesser offense. If there is a serious evidentiary dispute such that a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for the trial court not to give the instruction.

Poling v. State, 938 N.E.2d 1212, 1215 (Ind. Ct. App. 2010) (citation omitted). As the State concedes, conversion is an inherently included offense of theft. See id. at 1215 ("Indiana appellate courts have consistently held that criminal conversion is an inherently lesser included offense of theft because conversion may be established by proof of less than all the material elements of theft.").

16

Specifically, Class D felony theft is defined as knowingly or intentionally exerting unauthorized control over property of another person with the intent to deprive the other person of any part of its value or use. I.C. § 35-43-4-2(a). Class A misdemeanor conversion, on the other hand, is defined as knowingly or intentionally exerting unauthorized control over property of another person. I.C. § 35-43-4-3(a). Thus, "[t]heft requires the additional element of intent to deprive the other person of any part of the property's value or use." Poling, 938 N.E.2d at 1215.

Because conversion is an inherently lesser included offense of theft, we must determine whether there is a serious evidentiary dispute regarding Keller's intent to deprive Collier of any part of the value of the various items. It is undisputed that the tractor, Oldsmobile, and farm truck were sold after Keller discovered Collier's body. Keller relies on the purported agreement to split the proceeds of the sale of certain items, but it can hardly be said that there was a serious evidentiary dispute regarding whether he intended to deprive Collier of the value of the property he sold after Collier's death. Further, as the State points out, the purported agreement between Collier and Keller goes to the issue of whether Keller was authorized to the take the property. If Keller was so authorized, he would not have been found guilty of either theft or conversion. See Study v. State, 602 N.E.2d 1062, 1067 (Ind. Ct. App. 1992) (addressing whether the trial court properly refused Study's tendered conversion instruction and concluding that, where Study's defense was a claim of right, the jury could not have found him guilty of the lesser offense, conversion, and not guilty of the greater offense, theft).

17

As for the items of personal property, including the various checks, the rings,[4] and the rifle, these items were found in Keller's garage or house or had been presented for payment by Keller or on his behalf. Although Keller challenges the sufficiency of the State's case by questioning who may have taken the property, whether Collier's children had personal knowledge of Collier's property, or whether Keller burglarized Collier's house, he does not establish a serious evidentiary dispute regarding his intent to deprive Collier of the value of the items that were found in his house and garage or that were presented for payment on his behalf. Because there was no serious evidentiary dispute regarding whether Keller intended to deprive Collier of the value of the various items, the trial court did not abuse its discretion in refusing to instruct the jury on conversion.

## B. Single Larceny Rule Instruction

Keller also argues that the jury should have been given his tendered instruction on the single larceny rule. Pursuant to the single larceny rule, "when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons there is but a single 'larceny', i.e. a single offense." Raines v. State, 514 N.E.2d 298, 300 (Ind. 1987). "The rationale behind this rule is that the taking of several articles at the same time from the same place is pursuant to a single intent and design." Id. "If only one offense is committed, there may be but one judgment and one sentence." Id. (emphasis added).

---

[4] The fact that one of the rings was found in the ashtray of the Oldsmobile does not alter our conclusion that there is no serious evidentiary dispute that Keller intended the deprive Collier of the value of that ring either by taking it from Collier's house or by taking the Oldsmobile and selling it.

18

Even if we were to assume that the single larceny rule applies to the facts before us and there could only be one conviction and sentence for the multiple counts of theft, we do not believe that the application of this rule is a task for the jury, as opposed to the trial court. See Marshall v. State, 590 N.E.2d 627, 631 (Ind. Ct. App. 1992) ("Although a defendant charged and found guilty may not be convicted and sentenced more than once for the same offense or for a single larceny, the State has unrestricted discretion to file alleged repetitive charges." (footnote omitted)); Holt v. State, 178 Ind. App. 631, 638, 383 N.E.2d 467, 473 n.14 (1978) ("This is not to say that the State is prohibited from alleging the same charge in different counts. A single offense may be charged in more than one count, provided only a single judgment and sentence is imposed."). In other words, without more we are not convinced that it was improper for the jury to find Keller guilty of the multiple counts so long as the trial court, upon determining that the single larceny rule applied, only entered one judgment and sentence. Thus, Keller has not established that the trial court abused its discretion in refusing to instruct the jury on the single larceny rule.

### V. Application of the Single Larceny Rule/Continuing Crime Doctrine

Although the trial court did not abuse its discretion in rejecting Keller's single larceny rule instruction, we must determine whether the rule applies to limit some of Keller's convictions and sentences. Pursuant to the single larceny rule, a single offense is committed when several articles of property are taken at the same time, from the same place, belonging to the same person or to several persons. Raines, 514 N.E.2d at 300.

"The rationale behind this rule is that the taking of several articles at the same time from the same place is pursuant to a single intent and design." Id.

Regarding the convictions for the theft of the tractor, Oldsmobile, and farm truck, we believe that each vehicle must have been separately removed from Collier's property. This conclusion is supported by receipts from Partins showing that the Oldsmobile was sold on August 30, 2010, the farm truck was sold on September 15, 2010, and the tractor was sold on September 21, 2010. The evidence shows that the taking of the vehicles was not part of a single act of theft but were three separate and distinct criminal acts that warrant three separate convictions.

As for the rings and rifle, the State presented evidence that Collier had in the past kept those items in his house.[5] Although it is possible that Keller might have taken those items on separate occasions over the six-week period, the State presented no evidence that Collier did in fact take each of those items on separate occasions. In the absence of such evidence, the State failed to prove that Keller committed separate and distinct acts of theft, and separate convictions for Counts 7, 8, and 9 cannot stand. See Stout v. State, 479 N.E.2d 563, 568 (Ind. 1985) (holding that two convictions for two counts of theft, one relating to multiple items of personal property and one relating to an automobile in a garage, could not stand because "the Defendant exerted unauthorized control over several items of personal property, including an automobile, all of which were taken at the same time from the victim's home.").

---

[5] If the ring found in the Oldsmobile was already in the car when Keller took it, the separate theft conviction would still be barred under the single larceny rule. See Raines, 514 N.E.2d at 301.

The convictions for the theft of the Social Security check and the Edward Jones checks pose a more difficult question. In Count 4, the State alleged that Keller took the "social security check" and, in Count 5, the State alleged that Keller took the "Edward Jones checks." App. p. 430. The Edward Jones checks that Keller cashed on September 28, 2010, were dated September 2, 2010, September 3, 2010, and September 23, 2010. Of the checks found in Keller's garage, the Social Security check was dated September 3, 2010, two Edward Jones checks were dated September 1, 2010, and one Edward Jones check was dated September 15, 2010. In his statement to police, Keller admitted to taking mail from Collier's mailbox twice. It is not clear, however, whether the Social Security check was taken during a distinct act of theft or at the same time the Edward Jones checks were taken.

The State argues, "[a]s two of the Edward Jones checks were dated weeks later than the social security check, the trial court could infer that those thefts occurred at different times." Appellee's Br. p. 44. This is conjecture. There is no way to know whether Keller took the mail from the mailbox in late August and again after September 23, 2010, whether he took the mail for the first time on September 23, 2010, and then took more mail after that, or, based on the way the counts were charged, whether Keller took the Social Security check at the same time he took an Edward Jones check. Simply put, nothing in the record clearly shows that Keller did in fact take the Social Security check and the Edward Jones checks on two different occasions as opposed to during a single transaction. Without more the State has not established that Keller had a distinct

21

intent to take the Social Security check and the Edward Jones checks. Accordingly, the separate convictions for Counts 4 and 5 cannot stand.

As for the personal checks, Keller was charged with the theft of "personal checks." App. p. 430. Collier's daughter testified that, when she saw Collier in North Carolina over Christmas 2009, he kept his checkbook in the glove compartment of the GMC truck. Collier's son also testified that Collier kept his checks in the glove compartment. This is consistent with Keller's statement to police that he found a box of checks in the glove compartment of the GMC truck. In the absence of any evidence that the checks were taken from somewhere other than the truck, we must conclude that Keller took the personal checks when he stole the truck.

Had Keller simply taken the truck with the checks in the glove compartment, the single larceny rule would have prohibited the separate conviction for the theft of the personal checks. See Raines, 514 N.E.2d at 301 (applying the single larceny rule to prohibit separate convictions for the theft of scuba diving equipment and the theft of a pickup truck where the scuba diving equipment was either removed from the kitchen or was already inside the pickup truck parked in the driveway of the residence when it was taken). However, when Keller put the checks in his garage and used a check on October 7, 2010, to pay his electric bill and deposited two checks on October 8, 2010, he made an independent decision to exert control over the checks. Accordingly, merging the theft and auto theft conviction does not serve the purpose of the rule—to punish a single criminal design only once. See Taylor v. State, 879 N.E.2d 1198, 1204 (Ind. Ct. App. 2008) (affirming separate theft and auto theft convictions where, upon concluding it was

22

not worthwhile to keep the stolen car, defendant made an independent decision to steal a purse inside the car when he abandoned the car).

We conclude that the application of the single larceny rule permits only one conviction for the allegations of theft related to the items taken from Collier's house and one conviction for the items taken from the mailbox.[6] The remaining convictions for the theft of the tractor, Oldsmobile, farm truck, and personal checks do not violate the single larceny rule.

Keller also argues that his multiple theft convictions as a whole violate the continuing crime doctrine.[7] "The continuing crime doctrine essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." Walker v. State, 932 N.E.2d 733, 735 (Ind. Ct. App. 2010). The continuing crime doctrine reflects a category of Indiana's constitutional prohibition against double jeopardy. Id. at 736. The continuing crime doctrine may apply to those situations where a defendant has been charged multiple times with the

---

[6] We are not persuaded by the State's argument that Keller stole from Collier's investment income, entitlement income, and checking account, evidencing multiple criminal designs. First, Keller never presented the Social Security check for payment. Second, Keller was not charged with the theft of the funds from the various accounts—he was only charged with the theft of the checks themselves. Similarly, the State's reliance on Smith v. State, 770 N.E.2d 290 (Ind. 2002), is misplaced. Smith stole a checkbook and then forged the victim's signature and deposited six checks into his bank account at six different branches in a single afternoon. Smith, 770 N.E.2d at 292-93. Although Smith's six forgery convictions were affirmed, the court observed Smith was correct in asserting that, had he gone to trial, "he would (at most) have been convicted of just one count of theft." Id. at 296. The court remanded with instructions to vacate five of the six theft convictions and sentences. Id. at 298. Because Keller was not charged with forgery, Smith is distinguishable.

[7] These doctrines are closely related and in many of the cases the two concepts seem to overlap. Based on the manner in which Keller framed the argument, we analyze the continuing crime doctrine as it generally applies to the nine theft convictions as a whole.

23

same offense. Id. A defendant is charged multiple times with the same offense when he or she is charged multiple times with one offense or when he or she is charged with an offense and a lesser included offense. Id.

Keller asserts that his nine theft convictions should be reduced to one because they "were one single, continuous act: removing and disposing of the Deceased's property." Appellant's Br. p. 27. The evidence suggests that, after he discovered Collier's body, Keller repeatedly returned to Keller's farm and took various items over the course of six weeks. Although taking the various items over a six week period may have been part of a broad plan or scheme to steal from Collier, we are not convinced that Keller's conduct was so compressed in terms of time, place, singleness of purpose, and continuity that it constituted a single continuing act of theft. Keller has not shown that the multiple theft convictions should be reduced to a single conviction under the continuing crime doctrine. See Study, 602 N.E.2d at 1068 (explaining that multiple theft convictions can stand where a person, "on numerous successive days, exerts unauthorized control over another item of property of each successive day, all belonging to the same person . . . .").

### VI. Sufficiency

Keller challenges the sufficiency of the evidence to support his auto theft conviction, his convictions for the theft of the tractor, Oldsmobile, and farm truck, his burglary conviction, and his failure to report a dead body conviction. The standard of review for claims of insufficient evidence is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and we respect the jury's exclusive province to weigh conflicting evidence. Jackson v. State, 925 N.E.2d 369, 375 (Ind.

24

2010). We consider only the probative evidence and reasonable inferences supporting the verdict and affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. Id.

### A. Auto Theft

Keller argues that, if his October 11, 2010 statement is suppressed, there is no evidence that he exerted unauthorized control over the GMC truck. See I.C. § 35-43-4-2.5 (defining Class D felony auto theft as knowingly or intentionally exerting unauthorized control over the motor vehicle of another person, with intent to deprive the owner of the vehicle's value or use or a component part of the vehicle). As we have already concluded, Keller's October 11, 2010 statement was properly admitted into evidence. In that statement, Keller admitted to taking the truck without having an agreement with Collier for its sale. The evidence is sufficient to support the auto theft conviction.

### B. Theft

As for the theft of the tractor, Oldsmobile, and farm truck, Keller suggests that these items were part of an arrangement he had with Collier to be sold for scrap, suggesting that his possession of them was not unauthorized. See I.C. § 35-43-4-2 (defining Class D felony theft as knowingly or intentionally exerting unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use). Keller's argument is nothing more than a request to reweigh the evidence, which we cannot do.

25

According to Keller's statement to police, at most, he and Collier had an agreement to split the proceeds of sales. The jury, however, was free to reject this self-serving statement and conclude there was no such agreement or to accept it generally but conclude that any such agreement did not include the sale of these items.[8] Further, the receipts from Partins show that Keller sold these items after Collier's death, and the evidence shows that Keller did not give any of the proceeds to Collier's estate. From this evidence, the jury could infer that Keller exerted unauthorized control over the items with the intent to deprive Collier of their value. There is sufficient evidence to support these theft convictions.

## C. Burglary

Keller argues that there is no evidence that he entered Collier's house or that he took anything from it. See I.C. § 35-43-2-1(1) (defining Class B felony burglary in part as breaking and entering the structure of another person with the intent to commit a felony therein). Keller argues that the only evidence of a burglary was that an inner front door was ajar and a door window pane may or may not have been missing. He also claims there was no sign of forced entry. The State, however, was not required to prove that Keller caused damage when he entered Collier's house. "Using even the slightest force to gain unauthorized entry satisfies the breaking element of the crime." Davis v.

---

[8] At one point, Keller told police he was at Collier's to pick up the "last load of junk" when he found Collier's body. Tr. p. 597. Although Keller indicated that this occurred in early October, the jury could have believed only part of Keller's statement and concluded that there was no agreement pertaining to the items sold after Collier's death.

State, 770 N.E.2d 319, 322 (Ind. 2002). "For example, opening an unlocked door or pushing a door that is slightly ajar constitutes a breaking." Id.

In his statement to police, Keller said that he stopped by Collier's house a couple of times before finding him and "opened the door and hollered hey, hey, and that was it, left. Never stayed more than a minute."[9] Tr. p. 606. From this evidence, the jury could infer that the door was unlocked and that Keller did not have to actually break a window or door or otherwise force himself into the house to gain entry to the house. Moreover, the fact that items identified as Collier's were recovered from Keller's garage and home supports the inference that Keller opened the door and entered Collier's home to commit theft. Further, although Collier's house was not clean, he did keep his mail and other possessions organized. Collier's daughter testified that when they got there, "things were just dumped" and "it was just a big mess." Tr. p. 420. To the extent Keller challenged Collier's children's credibility because they had not been in the house recently, that evidence was before the jury for it to weigh accordingly. There is sufficient evidence to support the burglary conviction.

### D. Failure to Report a Dead Body

Keller argues there is insufficient evidence to support his conviction for failure to report a dead body as charged by the State. Count 13 provided in part, "Keller, having discovered the body of a deceased person who <u>died by violence</u>, and knowingly or

---

[9] Although Keller later told police that he found Collier's body shortly after seeing him alive, the jury was free to believe certain parts of his statement. See Parks v. State, 734 N.E.2d 694, 701 (Ind. Ct. App. 2000) ("The jury is free to believe portions of the victim's testimony and disregard other portions of the testimony."), trans. denied.

intentionally failed to report the body . . . ." App. p. 433 (emphasis added).  Indiana

Code Section 35-45-19-3 provides:

> A person who:
>
> (1) discovers or has custody of the body of a deceased person when it appears the deceased person died:
>
> > (A) by violence, suicide, or accident;
> >
> > (B) suddenly, while in apparent good health;
> >
> > (C) while unattended;
> >
> > (D) from poisoning or an overdose of drugs;
> >
> > (E) as the result of a disease that may constitute a threat to public health;
> >
> > (F) as the result of:
> >
> > > (i) a disease;
> > >
> > > (ii) an injury;
> > >
> > > (iii) a toxic effect; or
> > >
> > > (iv) unusual exertion;
> >
> > incurred within the scope of the deceased person's employment;
> >
> > (G) due to sudden infant death syndrome;
> >
> > (H) as the result of a diagnostic or therapeutic procedure; or
> >
> > (I) under any other suspicious or unusual circumstances; and
>
> (2) knowingly or intentionally fails to report the body of the deceased person to a:

28

> (A) public safety officer;
>
> (B) coroner;
>
> (C) physician; or
>
> (D) 911 telephone call center;
>
> within three (3) hours after finding the body;
>
> commits failure to report a dead body, a Class A misdemeanor.

Keller argues there is insufficient evidence that Collier appeared to die by violence because the forensic pathologist concluded there was "[n]o anatomic cause [of] death in this massively decomposed, mummified individual." Ex. 230; see also Tr. p. 733. Keller also points out that he was acquitted of the murder charge.

In response, the State directs us to the forensic pathologist's observation that the "[f]indings are consistent with homicide by undetermined means." Ex. 230. This finding, however, is not evidence that it would have appeared to Keller, upon seeing Collier's body in August, that Collier died by violence. This is especially true when considering the pathologist also testified that she could rule out a gunshot wound to the head, a gunshot wound to the chest, and a stabbing to the chest as the cause of death. See Tr. p. 734.

The State also points out that Collier's body was discovered near the edge of the property and was covered in weeds and brush. Collier's body, however, was found by police approximately six weeks after Keller said he had first seen it, and the State did not present any evidence showing what the scene looked like at the time Keller first saw the

body. Moreover, even if Collier's body had been intentionally obscured, there is no evidence that it should have been apparent to Keller that Collier died by violence. Contrary to the State's assertion, there is insufficient evidence from which the jury could infer that it appeared to Keller that Collier had died by violence.

Alternatively, the State asserts that, even if it failed to prove that Collier appeared to die by violence, it proved Keller's conduct fell within the catch-all provision, which creates a duty to report the discovery of a dead body when it appears the deceased died "under any other suspicious or unusual circumstances."[10] I.C. § 35-45-19-3(1)(I). The State contends that any variance between the charging information and the proof at trial was not fatal because the difference between the two provisions is "modest" and would not have affected Keller's defense and did not expose him to double jeopardy. Appellee's Br. p. 39. We disagree.

In Mitchem v. State, 685 N.E.2d 671, 677 (Ind. 1997), our supreme court explained the test to determine whether a variance between the proof at trial and a charging information or indictment is fatal as follows:

> (1) was the defendant misled by the variance in the evidence from the allegations and specifications in the charge in the preparation and maintenance of his defense, and was he harmed or prejudiced thereby;
>
> (2) will the defendant be protected in the future criminal proceeding covering the same event, facts, and evidence against double jeopardy?

---

[10] The jury was not instructed on this provision. It was only instructed on subsection (A), which provides "by violence, suicide, or accident." App. p. 540.

30

The court noted that applying this test is essential because it addresses the notice provision of Article 1, § 13 of the Indiana Constitution and the double jeopardy provision of Article 1, § 14 of the Indiana Constitution. Mitchem, 685 N.E.2d at 677 n.8.

The State claims, "Keller had no plausible defense to the charge because he admitted to the police that he had left Collier's body, having seen that Collier was dead, and even returned to check on the body later, yet still did not report it to anybody at any time." Appellee's Br. p. 39. This argument fails to acknowledge that a duty to report only arises in certain enumerated circumstances, and the State only and specifically alleged that Keller had a duty to report Collier's body because Collier appeared to have died by violence. Thus, Keller had available to him as defense that Collier did not appear to die by violence, which he asserted during his closing argument. Allowing a fall back or variance to "other suspicious or unusual circumstances" eliminates that defense. I.C. § 35-45-19-3(1)(I). Thus, the variance was prejudicial, and the State's proof failed.

We are well aware that, in light of Keller's admission, it seems counterintuitive, to say the least, to reverse this conviction. Nevertheless, "decisions whether to prosecute and what charges to file are within the prosecutor's discretion." Lampitok v. State, 817 N.E.2d 630, 636 (Ind. Ct. App. 2004). Here, the charging information specifically alleged that Collier "died by violence." App. p. 433. That specific part of the statute, and only that part of the statute, was pled. The State did not sustain its burden of proof on the enumerated charge. This is an example of the importance of the charging document and its contents. There is insufficient evidence to support the failure to report a dead body conviction.

31

## VII. Sentence

Based on our analysis of the single larceny rule and the sufficiency of the evidence, we remand for the trial court to vacate the convictions for Count 4, the theft of the Social Security check, Count 7, the theft of one ring, Count 8, the theft of the other ring, and Count 13, the failure to report a dead body. Because the trial court had ordered the sentences for Count 7 and Count 8 to run concurrent with the burglary sentence, Keller's total sentence is reduced by three years (two years for Count 4 and one year for Count 13) to twenty-nine years, with twenty-two executed and seven suspended. We review Keller's challenges to the sentence accordingly.

### A. Consecutive Sentences

Relying on Indiana Code Section 35-50-1-2, Keller appears to argue that all of his sentences should be run concurrently because they were a single episode of criminal conduct. Even if were to assume that the trial court's ability to impose consecutive sentences was limited by Indiana Code Section 35-50-1-2(c), Keller's sentence, as modified on appeal, does not exceed the statutory limit. Indiana Code Section 35-50-1-2(c) provides in part:

> However, except for crimes of violence, the total of the consecutive terms of imprisonment, exclusive of terms of imprisonment under IC 35-50-2-8 and IC 35-50-2-10, to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

32

Keller was convicted of Class B felony burglary. The advisory sentence for a Class A felony, the next higher felony, is thirty years. Accordingly, Keller's twenty-nine-year sentence does not exceed the advisory sentence of a Class A felony.

### B. Appropriateness

Keller also argues that his sentence is inappropriate in light of the nature of the offense and his character.[11] Indiana Appellate Rule 7(B) permits us to revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offenses and the character of the offender. Although Rule 7(B) does not require us to be "extremely" deferential to a trial court's sentencing decision, we still must give due consideration to that decision. Rutherford v. State, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We also understand and recognize the unique perspective a trial court brings to its sentencing decisions. Id. "Additionally, a defendant bears the burden of persuading the appellate court that his or her sentence is inappropriate." Id.

The principal role of Rule 7(B) review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008). We "should focus on the forest—

---

[11] To the extent Keller argues that the sentence and/or the aggravators should be reviewed for an abuse of discretion, "an inappropriate sentence analysis does not involve an argument that the trial court abused its discretion in sentencing the defendant." King v. State, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008). Further, "inappropriate sentence and abuse of discretion claims are to be analyzed separately." Id. Thus, we consider only whether Keller's sentence is inappropriate, and the failure to make a cogent argument regarding whether the trial court abused its discretion in sentencing him results in waiver of that issue.

the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." Id. Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. Id. at 1224. When reviewing the appropriateness of a sentence under Rule 7(B), we may consider all aspects of the penal consequences imposed by the trial court in sentencing the defendant, including whether a portion of the sentence was suspended. Davidson v. State, 926 N.E.2d 1023, 1025 (Ind. 2010).

As for the nature of the offense, after discovering seventy-nine-year-old Collier's body, Keller burglarized Collier's home and repeatedly stole from Collier while his remains decomposed outside for six weeks. Nothing about the nature of the offense warrants a reduction of his sentence. As for the character of the offender, although Keller was only twenty-two years old when he committed the offense, he has a prior conviction for conversion, which is similar to the present offenses. Keller also points out that his incarceration poses a financial hardship to his family; however, he did not have steady work when he committed the offenses and explained that he did so in part to pay his bills. We are not persuaded that the nature of the offense or Keller's character warrants reduction of the sentence.

**Conclusion**

Keller waived his right to challenge the State's amendment of the charging information. He has not shown that his right to a speedy trial was violated, that the admission of his statements to police was improper, or that the trial court abused its

34

discretion in instructing the jury. Pursuant to the single larceny rule, the convictions for theft of the Social Security check and for theft of the two rings must be vacated. Although there is sufficient evidence to support the auto theft, theft, and burglary convictions, there is insufficient evidence to support the failure to report a dead body conviction as charged by the State. Keller's modified sentence of twenty-nine years does not violate the statutory limit on consecutive sentences, and he has not shown that his sentence is inappropriate. We affirm in part, reverse in part, and remand.

Affirmed in part, reversed in in part, and remanded.

BAKER, J., and RILEY, J., concur.