**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Apr 09 2014, 9:16 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ERIC P. BABBS**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ZAR DYSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 27A02-1302-CR-135 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Jeffrey D. Todd, Judge
Cause No. 27D01-1012-FC-241

**April 9, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAKER, Judge**

This incident involved appellant-defendant Zar Dyson crashing into a vehicle and leading police on a high-speed chase. Dyson was arrested, and a jury convicted him of Intimidation,[1] a class C felony, Pointing a Firearm,[2] a class D felony, Resisting Law Enforcement,[3] a class D felony, Unlawful Use of Body Armor,[4] a class D felony, and Failure to Stop After an Accident,[5] a class C misdemeanor. The twenty-year aggregate sentence that the trial court imposed included concurrent terms on all counts totaling eight years, plus a twelve-year enhancement on an Habitual Offender[6] count.

On appeal, we conclude that the trial court properly denied Dyson's motion to strike an amended charging information and acted within its discretion in refusing to give his tendered jury instruction that defined "recklessly." We also conclude that the evidence was sufficient to support Dyson's convictions for intimidation and pointing a firearm. However, the conviction and sentence for the lesser offense—pointing a firearm—must be set aside on double jeopardy grounds because there was a reasonable possibility that the jury used the exact same evidence to convict Dyson of both offenses.

Additionally, we conclude that the twenty-year aggregate sentence that the trial court imposed was not inappropriate, except for the erroneous sentence that was imposed for

[1] Ind. Code § 35-45-2-1(a)(2)(b)(2).

[2] Ind. Code § 35-47-4-3(b).

[3] Ind. Code § 35-44-3-3(a)(3)(b)(1)(A).

[4] I.C. § 35-47-5-13.

[5] Ind. Code § 9-26-1-3.

[6] Ind. Code § 35-50-2-8(a).

2

pointing a firearm in light of double jeopardy principles, that the trial court's treatment of mitigating factors was proper, and that Dyson received the proper amount of credit time for pretrial home detention.

As a result, we affirm in part, reverse in part, and remand with instructions that the trial court vacate the conviction and sentence for pointing a firearm.[7]

FACTS

Around 3:30 a.m. on December 25, 2010, police officers responded to a dispatch concerning a disturbance at a Marion night club. When they arrived in the parking lot, they saw a black SUV strike another vehicle and drive away. Officer Brian Davis activated his lights and siren and commanded the SUV driver to stop. The driver, later determined to be Dyson, accelerated his SUV and traveled about seventy miles per hour down the snow-covered city streets. Officer Timothy Pauley and Sergeant Jared Reel also pursued Dyson.

While attempting to make a left turn, Dyson slid his SUV into a speed-limit sign and came to a stop. The driver's door flew open, and the SUV was illuminated by the interior lights and police lights. The three officers approached Dyson from different directions. Sergeant Reel noticed that Dyson had an AK-47-style assault rifle lying across his lap and pointing outward. Officer Pauley saw Dyson fumbling with something directly to his right, and he ordered Dyson to show his hands. Sergeant Reel repeated the command two or three times, but Dyson did not comply. Dyson looked at Officer Pauley, and the two made direct

---

[7] Dyson need not be resentenced in light of our decision to vacate the pointing a firearm conviction and sentence, inasmuch as the trial court—as discussed below—sentenced Dyson to the maximum sentence on all five counts that were ordered to run concurrently with each other.

3

eye contact. Sergeant Reel stated that he saw Dyson raise the rifle and point it at Officer Pauley. As Dyson emerged from the vehicle, both Sergeant Reel and Officer Davis fired their service weapons at him, whereupon he dropped his rifle and fell to the ground. As emergency vehicles were summoned, the officers tended to Dyson and discovered that he was wearing body armor in the form of a bullet-resistant vest. They also discovered that his rifle was equipped with a magazine containing seventy-one cartridges. Dyson was hospitalized, spent forty-three days in jail, and was released to in-home detention at his aunt's home pending trial.

On December 28, 2010, the State charged Dyson with class C felony intimidation, class D felony resisting law enforcement, class D felony pointing a firearm, and class C misdemeanor failing to stop after an accident. The State also filed a habitual offender count against Dyson. On December 30, 2010, the State amended the information, adding a count of class D felony unlawful use of body armor. On July 24, 2012, the State filed a motion to amend the intimidation count, which the trial court granted. Dyson filed a motion to strike the amendment, which the trial court denied. He then requested a continuance, which was granted.

Dyson's four-day jury trial commenced on November 26, 2012, and the jury found him guilty as charged. Dyson waived his right to a jury trial on the habitual offender count, and the trial court determined that he was a habitual offender. At sentencing, Dyson received concurrent maximum sentences on all five counts, for a total of eight years. The trial court enhanced his sentence by twelve years based on the habitual offender finding and

4

awarded him credit for forty-three days of pretrial incarceration. Dyson now appeals.

Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. Amendment of Charging Information

Dyson first asserts that the trial court erred in denying his motion to strike the State's

amendment to the intimidation count. Specifically, Dyson claims that the amendment

changed the theory of prosecution and prejudiced him.

Indiana Code section 35-34-1-5 governs amendments to the charging information and

states in pertinent part,

> (a) An indictment or information which charges the commission of an offense may not be dismissed but may be amended on motion by the prosecuting attorney at any time because of any immaterial defect, including:
>
> . . .
>
> (5) the use of alternative or disjunctive allegations as to the acts, means, intents, or results charged;
>
> . . . or
>
> (9) any other defect which does not prejudice the substantial rights of the defendant.
>
> (b) The indictment or information may be amended in matters of substance and the names of material witnesses may be added, by the prosecuting attorney, upon giving notice to the defendant at any time:
>
> (1) up to:
>
> (A) thirty (30) days if the defendant is charged with a felony;
>
> . . .
>
> before the omnibus date; or

5

(2) before the commencement of trial;

if the amendment does not prejudice the substantial rights of the defendant.

Dyson contends that the amendment was substantive and that he was prejudiced by it. However, the State claims that it requested the amendment merely to cure an immaterial defect by adding disjunctive language contained in the intimidation statute. Specifically, the original intimidation count stated only that Dyson communicated a threat with intent to place the officers in fear of retaliation for a prior lawful act. Ind. Code § 35-45-2-1(a)(2). The amendment added the disjunctive language contained in paragraph -(a)(1) of the intimidation statute, alleging alternatively that Dyson communicated a threat to the officers with the intent that they engage in conduct against their will.

Dyson claims that the addition of the paragraph -(a)(1) language amounted to a substantive amendment because it changed his entire theory of the case. Thus, he asserts that the amendment had to be filed no later than thirty days before the omnibus date, which it was not. The State counters that even assuming for argument's sake that the amendment was substantive rather than merely curative of an immaterial defect, Dyson did not establish prejudice.

We agree with the State and observe that when the trial court denied Dyson's motion to strike the amendment, Dyson requested and was granted a continuance. As a result, Dyson was afforded four months to prepare for trial following the State's amendment of the intimidation charge. See Keller v. State, 987 N.E.2d 1099, 1109 (Ind. Ct. App. 2013) (finding that the defendant was not prejudiced by the amendment to the charging

6

information where a continuance afforded the defendant two months to prepare a defense to the amended charge), trans. denied. In short, Dyson failed to establish that he was prejudiced by the State's amendment of the charging information, and we therefore conclude that the trial court did not err in denying his motion to strike the amendment.

## II. Tendered Jury Instruction

Dyson next contends that the trial court erred in refusing his tendered jury instruction that defined the term "recklessly." Dyson contends that because intent was a critical issue in this case, the trial court erroneously instructed the jury only as to "knowing" and "intentional" conduct. Appellant's App. p. 17.

In resolving this issue, we note that the trial court has broad discretion in instructing the jury, and as a result, we review the trial court's decision to give or refuse a party's tendered instruction under the abuse of discretion standard. Kane v. State, 976 N.E.2d 1228, 1231 (Ind. 2012). In conducting our review, we consider "(1) whether the tendered instruction correctly states the law; (2) whether there was evidence presented at trial to support giving the instruction; and (3) whether the substance of the instruction was covered by other instructions that were given." Id. at 1230-31. "The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." Gravens v. State, 836 N.E.2d 490, 493 (Ind. Ct. App. 2005) (citation omitted).

7

Here, Dyson tendered an instruction defining "recklessly."[8] All of Dyson's charged offenses require a mens rea of "knowingly" and/or "intentionally"; none involves conduct committed "recklessly." In Springer v. State, our Supreme Court addressed the propriety of refusing to give a jury instruction defining a mens rea different from, and less stringent than, the one required by the statute defining the charged offense. There, the charged offense was criminal recklessness, and the defendant challenged the trial court's rejection of his negligence instructions. 798 N.E.2d 431, 434 (Ind. 2003). The charge of criminal recklessness stemmed from an incident where the defendant grabbed his loaded, unlicensed firearm and went to confront a man who had been in an altercation with his son the night before. Id. at 435. When he burst into the man's home, his firearm discharged, injuring a third party. Although the firearm was equipped with functioning safety mechanisms, the defendant maintained that it discharged accidentally. Id.

In affirming the trial court's rejection of the defendant's tendered negligence instruction, it was emphasized that negligence was not Springer's legal defense but was merely an argument. Essentially, his legal defense was that he was not guilty of criminal recklessness because his actions did not meet the legal requirements of recklessness, about which the jury had been instructed. Id. The Springer court explained that although the defendant was free to and did argue that he did no more than fail to exercise reasonable care,

_____

[8] While Dyson's rejected instruction is not in the record, the parties stipulated that it read as follows: "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." Appellant's App. p. 219. The State does not challenge the legal accuracy of the instruction, but rather argues that the instruction was not relevant and could have confused or misled the jury.

his negligence argument was simply an allegation that the State failed to prove that he acted recklessly. Id.[9]

Likewise here, Dyson argued that he did not knowingly point the rifle at Officer Pauley and that he did not intentionally intimidate Officers Pauley, Davis, and Reel. He now contends that the trial court erred in refusing to give his tendered jury instruction defining recklessness "because the record contained evidence indicating [he] engaged in reckless behavior by, among other things, disregarding the officers' commands to show his hands and perhaps grasping the rifle without intent to point or use it." Appellant's Br. p. 18. The trial court addressed this claim when it ruled on the proffered instruction:

> While the Defendant is entitled to an instruction on any defense which has some foundation in evidence even when that evidence is weak or inconsistent, reckless is used by the Defendant here as an argument, not a legal defense. The Defendant is simply arguing that his actions did not meet the legal definitions of knowingly or intentionally and therefore the State did not meet its burden of proof as to some or all of the crimes charged. Not withstanding [sic] the Court's ruling, the Defendant is free to argue to the jury he did no more than act in a reckless manner.

Tr. at 494-95.

---

[9] The Springer court distinguished two cases upon which Dyson relies, Cichos v. State, 243 Ind. 187, 184 N.E.2d 1 (1962), and Sipp v. State, 514 N.E.2d 330 (Ind. Ct. App. 1987). Both Cichos and Sipp involved charges of reckless homicide stemming from an automobile collision, where negligence is a plausible legal defense. As the Cichos court explained,

> Whether the evidence in this case establishes that the deaths alleged in the indictment occurred from a mere accident, from negligent conduct or from willful and/or wanton misconduct so as to amount to recklessness, is dependent on the weight given the various aspects of the case and the evidence by the jury. The very purpose of the jury is to determine, after deliberation and pursuant to the court's instructions, the legal category into which the jury feels the defendant's conduct falls.

243 Ind. at 192, 184 N.E.2d at 3.

We agree that Dyson did not raise recklessness as a legal defense to his offenses of intimidation or pointing a firearm, or the unappealed offenses of unlawful use of body armor, resisting law enforcement, and failing to stop after an accident. Rather, the circumstances and offenses charged were such that he either knowingly or intentionally committed them or he did not commit them at all. In other words, unlike cases involving vehicle collisions where a driver may have driven recklessly, negligently, or reasonably, there is simply not a lesser way to commit these offenses. To have instructed the jury concerning the definition of recklessness when it was neither the required mens rea nor raised as a legal defense could have misled or confused the jurors. In sum, Dyson's arguments essentially amount to challenges to the sufficiency of the evidence, discussed below. As a result, we conclude that the trial court did not err in rejecting Dyson's tendered jury instruction.

## III. Sufficiency of Evidence

Dyson also challenges the sufficiency of the evidence to support his convictions for pointing a firearm and intimidation. When reviewing a sufficiency claim, we neither reweigh evidence nor judge witness credibility. Drane v. State, 867 N.E.2d 144, 146 (Ind. 2007). Rather, we consider only the evidence and reasonable inferences most favorable to the verdict and will affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." Id.

## A. Pointing a Firearm

In resolving Dyson's contentions, we first note that Indiana Code section 35-47-4-

3(b) provides that "A person who knowingly or intentionally points a firearm at another person commits a Class D felony. However, the offense is a Class A misdemeanor if the firearm was not loaded." Officer Pauley testified that although Dyson's firearm was on his lap when his vehicle crashed into the road sign, Dyson raised it and pointed it towards him. Tr. p. 267. Officer Pauley also stated that Dyson looked directly at him and that the two made direct eye contact. Officer Davis testified that he saw Dyson with the rifle, "and it was pointed at Pauley." Id. at 223. Sergeant Reel affirmed his previous statement that the rifle was "pointed at Officer Pauley." Id. at 423. This conduct is sufficient to support a reasonable inference that Dyson knowingly or intentionally pointed a firearm at Officer Pauley. See Mason v. State, 944 N.E.2d 68, 72 (Ind. Ct. App. 2011) (absent a confession, intent must be determined from consideration of defendant's conduct and its natural consequences), trans. denied. Dyson's claim that he only recklessly had his rifle pointed in the general direction of Officer Pauley amounts to an invitation to reweigh evidence and judge witness credibility, which we may not do. The evidence and reasonable inferences most favorable to the verdict are sufficient to support Dyson's conviction for pointing a firearm.

B.  Intimidation

Indiana Code section 35-45-2-1 states in pertinent part,

(a)  A person who communicates a threat to another person, with the intent:

> (1)  that the other person engage in conduct against the other person's will; [or]

> (2)  that the other person be placed in fear of retaliation for a prior

11

lawful act . . .

commits intimidation . . . .

>   (b) . . .

>>   (2) [a] Class C felony if:

>>>   (A)  while committing it, the person draws or uses a deadly weapon.

>>   . . . .

>>   (d)  "Threat" means an expression, by words or action, of an intention to:

>>>   (1)  unlawfully injure the person threatened or another person, or damage property; [or]

>>>   . . .

>>>   (3)  commit a crime.

The evidence most favorable to the verdict shows that when Dyson's vehicle came to a halt after he struck the road sign, the driver's door flew open. At that point, Officer Pauley and Sergeant Reel could see that he had a rifle pointed outward in the direction of Officer Pauley. At first, the officers could not see Dyson's hands, but Officer Pauley said that he could detect Dyson fumbling with something immediately to his right. Dyson refused to comply with the officers' repeated demands to show his hands. He also testified that he and Dyson made direct eye contact. Sergeant Reel testified that he saw Dyson raise the rifle up and that he believed that he and Officer Pauley were in danger. Tr. at 387, 423. He affirmed his previous report given three days after the incident in which he stated that Dyson had raised the rifle up "into his chest and pointed directly at Officer Pauley." Id. at 423.

Officer Davis stated that the rifle was in Dyson's hand and that he felt threatened and believed that he and Officer Pauley were both in danger. Id. at 192, 216, 223.

In our view, this evidence is sufficient to establish the communication of a threat. Moreover, the evidence concerning Dyson's eye contact with Officer Pauley supports a reasonable inference that he intended to place him and the other two officers in fear of retaliation for pursuing him after the hit-and-run. Dyson's arguments focus on specific matters about which the officers did not testify. For example, he states that the officers never said that they saw his hand on the trigger or saw him aim the rifle. However, after he refused to show his hands as ordered, Dyson raised his rifle and pointed it at Officer Pauley. Even absent any testimony concerning the exact position of his fingers on the rifle, the evidence is sufficient to support a reasonable inference that the officers were placed in fear of retaliation for having chased the fleeing Dyson. Moreover, Dyson's explanations for the positioning and placement of the rifle during the chase and at the time of impact are invitations to reweigh evidence, which we may not do. The evidence is sufficient to support his intimidation conviction.

## IV. Double Jeopardy

Dyson next contends that his convictions for both intimidation and pointing a firearm violate his constitutional protections against double jeopardy. We review double jeopardy claims de novo. Goldsberry v. State, 821 N.E.2d 447, 458 (Ind. Ct. App. 2005). Article I, Section 14 of the Indiana Constitution states, "No person shall be put in jeopardy twice for the same offense." In Richardson v. State, 717 N.E.2d 32 (Ind. 1999), our Supreme Court

13

established a two-part test for analyzing Indiana double jeopardy claims, defining two offenses as "the same offense" if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." Id. at 49. Because the actual evidence portion of the analysis is not required under the United States Constitution, the Richardson Court carefully articulated that under this inquiry, we must examine the evidence presented at trial "to determine whether each challenged offense was established by separate and distinct facts." Id. at 53. In other words, "a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense." Id. In applying the actual evidence test, we must identify the elements of each of the challenged offenses and evaluate the evidence from the jury's perspective, considering the charging information, jury instructions, and arguments of counsel. Garrett v. State, 992 N.E.2d 710, 720 (Ind. 2013).

Here, Dyson contends that the actual evidence used to convict him of pointing a firearm was also used to convict him of intimidation. The State necessarily had to prove beyond a reasonable doubt that Dyson knowingly or intentionally pointed a loaded firearm at Officer Pauley before the jury could find Dyson guilty of that offense. Appellant's App. p. 22. With regard to the intimidation count, the State was required to prove beyond a reasonable doubt that Dyson 1) communicated a threat; 2) to Officers Pauley, Davis or Reel; 3) with the intent that Officers Pauley, Davis or Reel engage in conduct against their will or

14

that any of the three officers be placed in fear of retaliation for a prior lawful act; 5) during the commission of this offense, drew or used a deadly weapon. I.C. § 35-45-2-1.

As for the intimidation count, the State alleged the threat communicated by Dyson was pointing the rifle. Tr. p. 517. The parties and the trial court agreed that the record contained no evidence that Dyson pointed a rifle at Officers Davis or Reel. Id. at 475-78. As a result, to the extent that the State proved intimidation, it did so by proving that Dyson pointed a gun at Officer Pauley. Additionally, the jury was instructed that it could find Dyson guilty of pointing a firearm only if the State proved beyond a reasonable doubt that Dyson knowingly or intentionally pointed the rifle at Officer Pauley. Appellant's App. p. 168.

In our view, this is not the type of case where the State "carefully parsed" the evidence at trial, and where dual convictions may stand. See Storey v. State, 875 N.E.2d 243, 248 (Ind. Ct. App. 2007) (upholding the defendant's convictions for both possession of methamphetamine in excess of three grams with intent to deliver and manufacture of methamphetamine in excess of three grams when the prosecutor "carefully parsed the evidence at trial, relying primarily on the finished product of methamphetamine to support the possession offense and the unfinished product to support the manufacturing offense").

When examining the closing arguments to the jury, the prosecutor described the same conduct in which Dyson engaged to support both counts. With regard to the pointing a firearm charge, the prosecutor stated to the jury:

15

why would he have that powerful weapon with seventy-one bullets in it in his lap[?] . . . Does it help him drive? Did it assist him in his intent to flee? What is a deadly weapon for? Do you think he accidentally held it in his hand and had it pointed in the direction of Officer Pauley? . . . [H]e didn't accidently have that gun in his hands. He either went for it when he knew he was now either trapped and he couldn't move and chose not to flee on foot or he had it in his lap before he came to the stop. Either way, . . . it's a deadly weapon, fully loaded.

Tr. p. 515. And for the intimidation charge, the prosecutor argued that the evidence proved this offense as follows:

What better expression of a threat than when one is surrounded by the police you are trying to flee and now you're stopped, you can't go anywhere, you pick up a rifle like that. This is not show and tell. This is not . . . I got this cool rifle I thought you'd like to see it. This is a threat and it speaks loudly. . . . Back off, you're not going to arrest me. . . . Back off. I'm trapped, and you're not going to arrest me. . . . [T]he Defendant did not want to be arrested . . . [and had] the intent that the [officers] be placed in fear of retaliation for a prior lawful act. You will pay for stopping me. . . . That's intimidation, a Class C felony. What other reason for drawing the deadly weapon than to say I'm not going to be arrested or I'm going to threaten you and you better not arrest me, you'll pay for stopping me. What other reason for holding the rifle in his hands when the vehicle comes to a stop, trapped on that street sign, officers on his left, on his right and behind him. Grab a gun there."

Id. at 517-18.

In light of the above, it is apparent that double jeopardy principles were implicated because the record reflects that the actual evidence used to convict Dyson of pointing a firearm was also used to convict him of intimidation. In other words, Dyson was able to demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of pointing a firearm were used to establish the essential elements of intimidation. Richardson, 717 N.E.2d at 53. Put another way, the record demonstrates that the jury relied on the same evidence to convict Dyson of both intimidation

16

and pointing a firearm—that is, evidence that Dyson pointed the rifle at Officer Pauley. Thus, the lesser conviction and sentence for pointing a firearm must be vacated in light of double jeopardy prohibitions.

## V. Sentencing

Dyson next argues that he was improperly sentenced. Specifically, he maintains that the trial court erred in finding no mitigating circumstances, that his sentence was inappropriate, and that the trial court should have awarded him credit for the time that he spent on pretrial in-home detention.

## A. Generally

We initially observe that sentencing decisions rest within the sound discretion of the trial court, and as long as a sentence is within the statutory range, it is subject to review only for an abuse of discretion. Anglemyer v. State, 868 N.E.2d 482, 490 (Ind. 2007), clarified on reh'g, 875 N.E.2d 218. An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. Robinson v. State, 894 N.E.2d 1038, 1042 (Ind. Ct. App. 2008). As discussed above, the trial court sentenced Dyson to an aggregate twenty-year term, comprising eight years for his four felony convictions and one misdemeanor conviction, all to run concurrently, plus a twelve-year enhancement on the habitual offender count. The most serious felony of which he was convicted was a class C felony, which carries a sentencing range of two to eight years, with a four-year advisory term. Ind. Code § 35-50-2-6. The trial court imposed a twelve-year habitual offender enhancement by calculating three times the four-year advisory term for a

17

class C felony. See Ind. Code § 35-50-2-8(h) (stating in pertinent part, "[t]he court shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense"). Because Dyson's sentence is within the statutory range, we review it for an abuse of discretion.

## B. Mitigating Circumstances

Dyson contends that the trial court abused its discretion in failing to consider as mitigating circumstances: (1) his poor health; (2) his low likelihood of reoffending or violating probation; and (3) his remorse. The trial court found no mitigating circumstances.

One way that a trial court may abuse its discretion is if the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration. Anglemyer, 868 N.E.2d at 491. The relative weight or value assignable to mitigators and aggravators is not subject to review for abuse of discretion. Id. The trial court is not obligated to accept the defendant's argument concerning what constitutes a mitigating factor. Healey v. State, 969 N.E.2d 607, 616 (Ind. Ct. App. 2012), trans. denied. Moreover, if the trial court does not find the existence of a mitigator after it has been argued by counsel, the court is not obligated to explain why it found the circumstance not to be mitigating. Anglemyer, 868 N.E.2d at 493.

Concerning Dyson's health, he is now disabled as a result of the events surrounding his commission of the instant offenses. He is wheelchair-bound and takes medication for pain. At the sentencing hearing, Dyson requested probation or home detention, testifying

18

that he had been neglected while incarcerated and had not violated any of the terms of his pretrial home detention. The trial court observed Dyson's physical limitations over a protracted period and was in the best position to evaluate his prospects for enduring the conditions attendant to incarceration. The court simply did not find that Dyson's physical disability amounted to a significant mitigating factor and noted that his own criminal acts resulted in his disability. Dyson essentially asks that we assign greater weight to this factor, and because we no longer review the weight assigned by the trial court to the defendant's proffered mitigators, we decline his invitation to do so. As a result, we conclude that the trial court acted within its discretion in its treatment of Dyson's health.

Regarding Dyson's likelihood of reoffending, probation officer Brad Kochanek testified that his department conducted two personal risk assessments on Dyson, and one found his risk to be very high while the other found it to be very low. Based on Dyson's extensive criminal history and six probation failures, his risk is certainly high. However, as a practical matter, his paraplegia and resulting inability to drive render him highly unlikely to lead police on another vehicle chase. As such, his risk of reoffending in this particular way has decreased due to his physical limitations. Nevertheless, his criminal history includes offenses which are not necessarily deterred by a physical disability, such as his 2003 class C felony convictions for cocaine possession and intimidation with an assault rifle. Likewise, Dyson's repeated probation failures and disrespect for rules negatively implicate his prospects for successful probation, since many probation conditions are as equally subject to violation by a disabled probationer as by an able-bodied one. The trial

court heard Dyson's arguments that his physical disability portends a law-abiding life and did not find them compelling. We decline Dyson's invitation to assign greater weight to this proffered mitigator and find no abuse of discretion in the trial court's treatment of it.

As for Dyson's remorse, he cites his testimony at sentencing that he did not blame the police for his injuries but instead blames himself. Interestingly, his emphasis was not on his sorrow at having committed the criminal acts, but rather on absolving the officers for his own injuries that flowed from those acts. In other words, he never expressed regret for committing the crimes, for having placed the officers in imminent fear of being shot, or for endangering the officers during their pursuit over icy roads. Instead, he characterized his decision to go out that night wearing body armor and carrying an assault rifle as follows: "it wasn't the best decision, but I'm very protective of my family. . . . Maybe not the right way to do it, but a guy had shot my brother. . . . I wasn't gonna look for anyone. I just felt I needed to protect myself just in case." Tr. p. 587-88.

The trial court observed Dyson's demeanor firsthand throughout the proceedings and was therefore in a better position to evaluate his sincerity or lack thereof. Sharkey v. State, 967 N.E.2d 1074, 1079 (Ind. Ct. App. 2012). In short, the trial court did not overlook Dyson's alleged remorse; it simply did not find remorse to be a significant mitigating circumstance. See Phelps v. State, 969 N.E.2d 1009, 1020 (Ind. Ct. App. 2012) (holding that a trial court is under no obligation to accept a defendant's alleged remorse as a mitigating circumstance), trans. denied. We find no abuse of discretion in the trial court's treatment of Dyson's alleged remorse.

20

## C. Inappropriate Sentence

Dyson also requests that we reduce and revise his sentence pursuant to Indiana Appellate Rule 7(B), which states that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." When a defendant requests appellate review and revision of his sentence, we have the power to affirm or reduce the sentence. Akard v. State, 937 N.E.2d 811, 813 (Ind. 2010). In conducting our review, we do not look to see whether the defendant's sentence is appropriate or if another sentence might be more appropriate; rather, the test is whether the sentence is "inappropriate." Fonner v. State, 876 N.E.2d 340, 344 (Ind. Ct. App. 2007). A defendant bears the burden of persuading this Court that his sentence meets the inappropriateness standard. Anglemyer, 868 N.E.2d at 490; Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

In considering the nature of a defendant's offense, "the advisory sentence is the starting point the Legislature has selected as an appropriate sentence." Anglemyer, 868 N.E.2d at 494. Dyson's twenty-year aggregate term consists of concurrent terms on four felony convictions and one misdemeanor conviction, plus a habitual offender enhancement. The trial court imposed the maximum sentences on all counts and enhanced his sentence by twelve years, the maximum allowable when the most serious underlying offense is a class C felony.

As for the nature of the offenses, Dyson's convictions stem from a harrowing chain

21

of events that began when Dyson, outfitted in body armor and toting an AK-47-style assault rifle with seventy-one rounds of ammunition, drove his vehicle into a parked vehicle, failed to stop at the scene of the accident, engaged police in a chase over icy roads, and ultimately crashed. On impact, Dyson's driver's side door flew open, and police could see his assault rifle directed at Officer Pauley. Dyson appeared to have his right hand on the rifle, and the officers repeatedly ordered him to show his hands. When he refused to comply and emerged from the vehicle, they fired on him. Clearly, the escalation from a simple hit-and-run property damage incident to a violent, life-threatening incident can be traced to Dyson's conduct in brandishing a lethal weapon with enough firepower to have caused widespread devastation and, therefore, justifies a sentence above the advisory term.

With respect to Dyson's character, we need look no further than his lengthy history of criminal conduct, which started at age ten and spans twenty-five years. Even as a youngster, he demonstrated disrespect for authority and the law, with adjudications for resisting law enforcement, disorderly conduct, and underage possession of alcohol. Dyson had multiple adjudications for offenses that would have been class C and D felonies if committed by an adult, such as robbery, theft, criminal recklessness with a deadly weapon, and possession of a firearm on school property. His adult criminal record consists of seven felony convictions, four misdemeanor convictions, and six probation violations. Dyson has a pattern of violent behavior, often directed at police officers, with felony and misdemeanor convictions for both resisting law enforcement and battery resulting in bodily injury. He also has a 2003 conviction for class C felony intimidation involving the use of a deadly weapon, specifically

22

an assault-style rifle similar to the one he possessed in this case. Simply put, the record shows Dyson to be a career criminal with a demonstrated propensity to act violently, especially toward law enforcement personnel. While we are mindful of the severe physical injuries that Dyson sustained during the chase and ensuing firefight, we do not find the injuries themselves to be a reflection of character. In sum, Dyson has failed to meet his burden of establishing that his sentence is inappropriate in light of the nature of the offenses and his character.

## VI. Credit Time Calculation

Finally, Dyson asserts that the trial court erred in failing to include credit for the time he spent on pretrial in-home detention.[10] When a defendant who has not yet been convicted serves a stint of pretrial home detention, no statute mandates credit for time served against his eventual sentence. Lewis v. State, 898 N.E.2d 1286, 1290 (Ind. Ct. App. 2009). Where no statute mandates an award of credit time, the decision to award credit for such time is a matter within the trial court's discretion and is therefore reviewed for an abuse of that discretion. Id.

In Lewis, another panel of this Court rejected the defendant's arguments that denying

---

[10] The State asserts that Dyson has waived this issue for failure to raise it below. When the trial court pronounced sentence, it stated that Dyson was "entitled to forty-three actual and [a total of] eighty-six class I credit days towards his sentence." Tr. p. 624; see also Appellant's App. p. 15 (sentencing order listing Dyson's days served at forty-three and credit time of eighty-six days). Dyson did not interject or attempt to discern whether the trial court intended to credit time for the nearly two years spent in pretrial home detention. However, the State fails to cite any cases specifically dealing with waiver in the context of good-time credit. In Buchanan v. State, 956 N.E.2d 124, 127 (Ind. Ct. App. 2011), another panel of this Court chose to address the defendant's credit-time challenge on the merits even though his plea agreement stated that his sentence would reflect that he was a credit-restricted felon. Likewise, we choose to address Dyson's argument on the merits.

credit time for a pretrial home detainee while statutorily mandating credit time for a postsentence home detainee amounts to a violation of the detainee's equal protection rights as well as his rights under the Indiana Constitution's equal privileges and immunities clause. Id. at 1290-91. The Lewis court emphasized the difference in the positions of pretrial and postsentence home detainees concerning the presumption of innocence and concluded that the two were neither "similarly situated" nor subjected to "disparate" or "preferential" treatment." Id. at 1290 (citing Senn v. State, 766 N.E.2d 1190, 1202 (Ind. Ct. App. 2002)).[11]

Here, Dyson spent approximately two months in the hospital immediately following the incident. He subsequently requested and was granted pretrial in-home detention at his aunt's home, where he spent 644 days. The court imposed the following conditions:

> THE COURT: …. Bond will be set in the sum of Thirty Thousand Dollars ($30,000.00) cash, surety or property. The Defendant may post ten percent of that amount to affect his release. He will have conditions on his release should he post bond. He will be confined to his aunt's home in Kokomo. He may only leave that home for doctor's appointments. He will be monitored by Wayne Ellis from Community Corrections. I'm not going to be require [sic] that be a formal monitoring with an electronic device. However, the Defendant must allow Mr. Ellis access to the residence in which he is staying or by any designee that Mr. Ellis elects to also have access without notice to the home for supervision. He must maintain a phone number and provide both his cell phone number, his aunt's land line number and also her cell phone number. He will not possess any firearms while out on bond. He may not possess any legal [sic] substances, any drugs that are in his possession, he must have a valid prescription for each of those drugs, and he's not to possess alcohol while out on bond. To make it clear as far as his ability to leave his home, he may be allowed to leave for doctor's appointments, as I deem those to be necessary. However, he must give Mr. Ellis advance notice of when those appointment[s] are. He must telephone Mr. Ellis or a designee

---

[11] Many of the cases cited by Dyson involve persons convicted and who either served in-home detention prior to sentencing or postsentencing. In either circumstance, the person has already been convicted and has lost the presumption of innocence. For reasons cited in Lewis, Dyson, as a pretrial detainee, was not similarly situated to those persons.

24

when he leaves for a doctor's appointment and must also telephone Mr. Ellis when he returns from those appointments.

[DEFENSE COUNSEL]: Does that include physical therapy, I'm assuming?

THE COURT: It does.

[DEFENSE COUNSEL]: And as far as when he needs to come see me in defense of his, preparation of his case?

THE COURT: I will make that exception also.

[DEFENSE COUNSEL]: Okay.

THE COURT: But that's still, uh, is a case where Mr. Ellis must be made aware of where he will be and when he leaves and when he returns.

[DEFENSE COUNSEL]: Okay.

Tr. p. 29-30.

The parties paint a vastly different picture of Dyson's pretrial home detention. Dyson claims that his home detention was more restrictive than most such detention arrangements, citing the trial court's order that he stay on the premises except to go to doctor's appointments, physical therapy appointments, and appointments with his attorney. He also cites the requirement that he submit to unannounced visits from community corrections and that he notify community corrections each time he would leave and return to the premises.[12] The State emphasizes that the trial court did not require Dyson to wear an electronic monitoring bracelet and did not limit the visitors that he could entertain while on detention.

---

[12] In contrast, other home detainees may leave the premises for work or educational reasons or to attend church services. Ind. Code § 35-38-2.5-6(1).

He was under the care of his aunt in her home and was limited as much by his injuries as anything else. The trial court, familiar with the unique set of circumstances, took his injuries into consideration. The record shows a person with an extensive record of disdain for law enforcement who, but for his injuries, almost certainly would have been incarcerated pending his trial. In short, Dyson asks us to reweigh evidence concerning the severity of his pretrial restrictions, which we may not do. We find no abuse of discretion in the trial court's decision not to award him credit for time spent in pretrial home detention. Accordingly, we affirm.

## CONCLUSION

In light of our discussion above, we conclude that the trial court properly denied Dyson's motion to strike the State's amended charging information and properly refused his tendered jury instruction that defined "recklessly." We also conclude that the evidence was sufficient to support Dyson's convictions for intimidation and pointing a firearm. However, the conviction and sentence for the lesser offense—pointing a firearm—must be vacated on double jeopardy grounds because there is a reasonable possibility that the jury used the exact same evidence to convict Dyson of both offenses.

We also conclude that Dyson failed to show that the twenty-year aggregate sentence that the trial court imposed was inappropriate, except for the erroneous sentence on pointing a firearm conviction in light of double jeopardy principles, that the trial court's treatment of proposed mitigating factors was proper, and that the trial court acted within its discretion under the circumstances in not awarding Dyson any credit time for the time that he spent in

26

pretrial home detention.  We therefore affirm in part, reverse in part, and remand with instructions that the trial court vacate the conviction and sentence for pointing a firearm.

NAJAM, J., concurs, and CRONE, J., concurs and dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

ZAR DYSON,                         )
)
    Appellant-Defendant,      )
)
             vs.              )     No. 27A02-1302-CR-135
)
STATE OF INDIANA,           )
)
    Appellee-Plaintiff.        )

APPEAL FROM THE GRANT SUPERIOR COURT
The Honorable Jeffrey D. Todd, Judge
Cause No. 27D01-1012-FC-241

**CRONE, Judge, concurring in part and dissenting in part**

I respectfully dissent from the majority's decision to vacate Dyson's pointing a firearm conviction based on double jeopardy concerns. In *Spivey v. State*, 761 N.E.2d 831 (Ind. 2002), our supreme court explained that the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, but not all, of the essential elements of a second offense. *Id*. at 833. In applying Indiana's actual evidence test, we must identify the elements of each of the challenged offenses and evaluate the evidence from the jury's perspective,

28

considering the charging information, jury instructions, and arguments of counsel. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008).

The majority concludes that "the jury relied on the same evidence to convict Dyson of both intimidation and pointing a firearm—that is, evidence that Dyson pointed the rifle at Officer Pauley." Slip op. at 16-17. Citing the prosecutor's closing argument, the majority concludes, "As for the intimidation count, the State alleged the threat communicated by Dyson was pointing the rifle." Id. at 15 (citing Tr. at 517). In reviewing this portion of the transcript, I find that in addressing the communication of a threat sufficient to intimidate the officers, the prosecutor did not speak in terms of "pointing" the rifle; rather, he used the terms, "hold it in his hands," "pick up [the] rifle," and "picking up and holding that rifle." Tr. at 517. The prosecutor had referred to Dyson "pointing" the rifle *earlier* in his summation when he was addressing Count III, pointing a firearm. *Id*. at 512-13, 515. In his rebuttal, the prosecutor emphasized the threat that Dyson communicated to all of the officers: "Holding a loaded AK-47 style rifle means I'm going to use this rifle. I'm going to use in some fashion." *Id*. at 568. In his final words to the jury, the prosecutor distinguished the two offenses in stating, "He did point a firearm at another person, *and* he did use that gun to threaten those officers." *Id*. at 569 (emphasis added). Simply put, I do not find that the prosecutor's closing statement emphasized a single act, Dyson *pointing* his rifle at Officer Pauley, to establish both offenses.

Moreover, Sergeant Reel and Officer Davis both testified that they feared not only for Officer Pauley's safety, but also for their own. *See, e.g.*, *id*. at 175 (Officer Davis's

29

testimony that "I was in fear for Officer Pauley's [safety] and then mine afterwards."). Officer Davis had served in the military and testified that Dyson's rifle was readily identifiable to him as an AK-47 assault rifle capable of rapid-firing numerous rounds of ammunition. *Id*. at 179-81. In short, the sheer firepower of the rifle in Dyson's hands communicated a threat, regardless of its exact position.

Finally, the jury instructions covering the two offenses were drafted to indicate separate and distinct facts. At the close of the evidence, the trial court emphasized to counsel a distinction in the wording of the two instructions, namely that the instruction on pointing a firearm would be specific to Officer Pauley only, whereas the instruction on intimidation would include the names of each of the three officers. *Id*. at 496.

In sum, the State's closing argument, the evidence, and the jury instructions sufficiently presented the two offenses as separate and distinct. Dyson pointed his loaded rifle only at Officer Pauley. He intimidated all three officers, who were placed in fear of retaliation when they saw that he was holding an assault rifle and refused to show his hands. Intimidation was not dependent upon the rifle's position. Instead, it needed only to have been raised. Dyson was not placed in double jeopardy. Thus, I would affirm his convictions for both offenses. In all other respects, I concur.