## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 16 2017, 10:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Robert G. Bottorff, II
Bob Bottorff Law, PC
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher A. Bruck,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 16, 2017<br>Court of Appeals Case No.<br>10A05-1612-CR-2865<br>Appeal from the Clark Circuit Court<br>The Honorable Vicki L. Carmichael, Judge<br>Trial Court Cause No.<br>10C04-1501-F3-1 |

**Barnes, Judge.**

# Case Summary

Christopher Bruck appeals his convictions and sentence for Level 1 felony aggravated battery and Level 6 felony neglect of a dependent. We affirm.

# Issues

The issues before us are:

> I. whether the trial court properly admitted Bruck's three statements to police into evidence over his objection that they had been obtained in violation of his *Miranda* rights;

> II. whether the State established a sufficient corpus delicti to allow the admission of Bruck's statements into evidence;

> III. whether the trial court properly admitted testimony and documentary evidence from one of the State's expert witnesses;

> IV. whether the trial court properly denied Bruck's motion for public funds to hire an expert witness; and

> V. whether the trial court properly sentenced Bruck to an aggregate term of forty-two-and-one-half years.

# Facts

Bruck is the father of Hayden Dukes, who was four years old in January 2015. Hayden's mother is Amanda Dukes. Hayden suffered from a genetic disorder known as DiGeorge Syndrome. As a result of this condition, Hayden was non-verbal and had signs of autism, was very small for his age, and was asthmatic.

He did not begin walking until around four years of age. Bruck and Amanda lived separately. On December 31, 2014, Amanda brought Hayden to Bruck's residence for Hayden's first-ever overnight visitation with Bruck, which was to last four days. At this time, Bruck was living with his wife, Yulanda, in the basement of a house rented by Yulanda's parents, Lovette and John Hall, in Floyd County. Hayden seemed to have a slight cold when Amanda dropped him off but no other ailments, although he would require regular breathing treatments for his asthma. Although DiGeorge Syndrome can sometimes cause seizures, Hayden had no prior history of seizures.

[4] In the mid-to-late-afternoon of January 3, 2015, Bruck was in the basement with Hayden and two of his other children, watching a basketball game. During this time, Yulanda and Lovette were upstairs watching television with another of Yulanda's children, and John was asleep in an upstairs bedroom. At around 5:30 p.m., Bruck yelled from downstairs that Hayden was having a seizure. Shortly thereafter, Bruck called 911, while Yulanda carried Hayden upstairs and laid him on a couch. Yulanda did not drop Hayden or bump his head on anything while carrying him.

[5] Hayden first was transported by ambulance to Scott County Memorial Hospital ("Scott Hospital"); Bruck rode in the ambulance with Hayden. When Hayden arrived at the hospital around 6 p.m., he was not making any voluntary movements, had a low heart rate and difficulty breathing, and was having seizures. Bruck informed emergency room physician Dr. Rafael Carter that Hayden had been having a fever and cold-like symptoms and denied that he

had suffered any injury or trauma. Based on this information, Dr. Carter originally investigated the possibility that Hayden had sepsis resulting from pneumonia.[1] Because of the severity of Hayden's condition, it was decided it would be necessary to transport him to Kosair Children's Hospital in Louisville, Kentucky ("Kosair"). At about 8 p.m., a physician at Kosair requested that a CT scan of Hayden's head be performed before transporting him. The scan was performed around 9 p.m. and revealed that Hayden had a large subdural hematoma with a midline shift. This meant that there was severe bleeding between Hayden's brain and skull, and that the brain was swelling so much that the right hemisphere was pushing into the left hemisphere. Subdural hematomas with midline shift are very serious and frequently lead to death. After learning the CT scan results, Dr. Carter told Bruck that Hayden must have suffered some kind of trauma to sustain an injury like that. Bruck then told Dr. Carter that in the middle of the previous night, Hayden had walked into the door frame of Bruck and Yulanda's bedroom. However, Dr. Carter believed, based on the severity of Hayden's head trauma, that the head trauma could not possibly have been caused by Hayden walking into a door frame. Dr. Carter also would have ordered a CT scan and begun administering drugs to Hayden to alleviate brain swelling much earlier if he initially was aware Hayden had sustained a head trauma.

---

[1] Blood test results later confirmed that Hayden did not have pneumonia or sepsis.

[6] At some point, someone at Scott Hospital called the Indiana State Police ("ISP") to report that he or she suspected Hayden of having been abused. Troopers Zachary Smith and Nick Yaeger arrived at Scott Hospital shortly thereafter, in full uniform and driving their police cruisers. When the ambulance arrived from Kosair to transport Hayden, Bruck had no way of going to Kosair. Trooper Smith offered Bruck a ride to Kosair, which he accepted. Bruck rode in the front of Trooper Smith's cruiser and was not handcuffed or restrained in any way, and the two engaged in normal conversation during the ride. Meanwhile, Trooper Yeager contacted ISP Detective Rachel Abbott and informed her of the suspected abuse and that Hayden was being transported to Kosair. ISP Detective David Mitchell also was contacted and headed toward Kosair.

[7] When arriving at Kosair, Bruck initially went to a public emergency room waiting room. Troopers Smith and Yaeger also were at the hospital, but they did not attempt to monitor Bruck's whereabouts or restrict his movements in any way, nor were they ever ordered to do so by any superiors. Detective Abbott arrived at Kosair around 10:30 p.m., approached Bruck in the waiting room, and said she wanted to ask him some questions about Hayden. Bruck readily agreed. Detective Abbott was in plain clothes but wearing her badge and gun on her belt. Detective Abbott and Bruck then went to a conference room of some type to talk, as arranged by a Kosair employee. The precise layout of this room is unclear—Detective Abbott described it as more like a business conference room, with a large table surrounded by about ten chairs.

Detective Mitchell recalled the room as resembling an employee break room, with a small table, microwave, water fountain, and room for six to seven people. Trooper Smith recalled that the room was a "crisis room" for families of ill children, which resembled a residential family room, including a few seats, table, and television. Tr. Vol. II p. 106. The room was in a non-public area of the hospital and had an unlocked door and no windows.[2]

[8] Detective Abbott began interviewing Bruck at about 10:55 p.m. Before the recording began, Detective Abbott told Bruck that he was free to leave. Bruck was not handcuffed or restrained in any way. Troopers Smith and Yaeger were sometimes in the hallway outside the room, but they were not guarding the door. Detective Abbott did not warn Bruck of his *Miranda* rights. Bruck professed ignorance at what could have caused Hayden's head trauma, except that he reiterated the story about Hayden having hit his head on the bedroom door frame during the previous night and said, "I don't know if that could have caused what's been going on or not." Tr. Vol. I p. 65. Bruck said that Hayden mostly acted normal the next day, except for having a slight nosebleed when he woke up. Bruck continued that Hayden appeared normal before suddenly having a seizure while he was in the basement with Hayden at about 6 p.m., at which time he called 911. During the interview, Bruck's phone rang several times. Bruck told Detective Abbott, "I'm trying to get a ride back, because I'm

---

[2] Although Detectives Abbott and Mitchell conducted two recorded interviews of Bruck in this room, both were audio-only recordings.

going to be stranded." *Id.* at 80.  Detective Abbott responded in part, "Well, I will say this, I will say you probably need to stay a little bit longer, because I think Hayden might be having surgery." *Id.* at 82.  Bruck said, "Yeah, I'm going to find out what's going on." *Id.*  Bruck did in fact answer a call, apparently from Yulanda, during the interview.

[9]  Bruck then repeated his story that Hayden had hit his head on the door frame of his bedroom the night before and said that Hayden generally avoided playing with Bruck and Yulanda's other children.  As the interview ended, the following exchange took place:

> Abbott: Your little boy, I mean, it's very serious.
>
> Bruck:  I know.
>
> Abbott:  So I think you need to stick around.
>
> Bruck: I'm going to, I'm not going to leave any time soon.
>
> Abbott: Okay. We might need to talk to you again afterwards, because we're—this is all—I mean.
>
> Bruck: That's fine. You can talk to my wife, you can talk to her mom and dad, you can check out my kids, that's fine.
>
> Abbott: Okay. All right. Are you just going to stay here or do you know where you're going to be?
>
> Bruck: Actually, I've got to find out where they are going.

*Id.* at 94. Detective Abbott then verified that she had Bruck's phone number, and the interview ended. Bruck was cooperative the whole time. The interview lasted approximately thirty-five minutes. Detective Mitchell arrived at Kosair sometime during this interview. Like Detective Abbott, he was wearing plain clothes, with his badge and gun on his belt.

[10] As this first interview was taking place, Hayden was beginning to undergo surgery. When Hayden was admitted to Kosair, ER physician Dr. Megan Laniewicz noted a number of contusions, including ones on his right forehead, abdomen, shoulder, left knee, and lower leg. Dr. Laniewicz believed the bruising on Hayden's abdomen and shoulder was not typical childhood bruising. Also, she thought that the severity of Hayden's subdural hematoma was similar to something often seen "in the setting of a motor vehicle crash or a significant free fall, a fall from a second story window, something where you have a significant speed and then that is—you get deceleration, a sudden deceleration of the body, and the brain then shifts in the skull." Tr. Vol. V p. 95.

[11] Dr. William Gump performed neurosurgery on Hayden. He removed a portion of Hayden's skull, removed the subdural blood clot, attempted to stop bleeding within the brain itself, and inserted a monitor to constantly measure the pressure on Hayden's brain. The pressure remained high even after surgery and continued to increase. After surgery, Dr. Gump told Detective Mitchell that Hayden only had a thirty percent chance of surviving. Dr. Gump also believed Hayden's subdural hematoma was the result of an acute injury and not a

chronic condition. Dr. Gump compared Hayden's injury to one he had previously seen in a child who had been picked up by a tornado and dropped seven miles from home. He also believed it resembled a high-speed car crash injury or one from a ten-story fall into a bush. He did not think that either walking into a door frame or falling down three of four stairs could possibly have caused Hayden's brain trauma.

[12] Hayden's surgery ended a little after 1 a.m. on January 4, 2015. After Dr. Gump went over the surgery and prognosis with Detective Mitchell, Detectives Mitchell and Abbott decided to re-interview Bruck because what he had said in the first interview did not seem consistent with the trauma Dr. Gump described. It appears Bruck was still in the "conference room" when Detectives Mitchell and Abbot found him and requested a second interview, to which he readily agreed, without coercion or threats. Between the first and second interviews, no one told Bruck he had to stay in the room. At one point he went looking for a restroom, and no one told him to go back to the room.

[13] The second interview began at 1:22 a.m. Again, no *Miranda* warnings were given. Bruck started by reiterating that the only possible way he knew of that Hayden's head could have been injured was when he walked into the bedroom door frame the previous night. Detective Mitchell then began telling Bruck that Hayden could not have injured himself the way Bruck had described. Detective Mitchell also repeatedly told Bruck that the doctors needed to know as much as possible about how Hayden was injured in order to treat him properly. This was untrue, however. At one point, Detective Mitchell suggested that Hayden

could have fallen down some stairs, at which point Bruck said, "If I remember, I think he did fall down a few steps." Tr. Vol. I p. 129. Bruck said he had not previously told anyone that because "[w]e've had CPS on our case." *Id.* at 130. Bruck described how the basement floor was concrete with a thin layer of carpeting over it, and Hayden had hit the right side of his head hard after falling down a few steps. Detective Mitchell was not satisfied with this response and continued asking Bruck to tell them what had really happened. Finally, Bruck said that, while he was watching a basketball game with his younger son on his lap, "He [Hayden] was trying to pull my hand and I wouldn't let up. . . . I was sitting there and I was into a f***ing stupid ass game. . . . I thumped him on the head. . . . With my hand . . ., he fell back. . . . And his head hit like the floor." *Id.* at 139-40. Bruck explained that he hit Hayden in the forehead with the heel of his palm, causing him to fall backwards onto the floor. He also said that this occurred at about 4 or 4:30 p.m. and that Hayden managed to crawl into bed afterwards, but that he knew something was wrong because Hayden was holding his head at an unusual angle.

[14]    After the second interview, Detectives Mitchell and Abbott wanted to arrest Bruck, but neither one of them had arrest powers in Kentucky. Thus, they told Bruck that they wanted to bring him to his house so he could show them where the incident happened and so they could talk to Yulanda. However, the detectives actually wanted to bring Bruck to the Sellersburg ISP post. They asked Trooper Yaeger to drive him there. Bruck voluntarily agreed to go with

Trooper Yaeger, and again he rode in the front seat and was not restrained, although he was unaware he was being driven to an ISP post.

[15] After arriving at the post, Detective Abbott questioned Bruck a third time in an interview room. This time, Detective Abbott did verbally inform Bruck of his *Miranda* rights and gave him a written advice of rights and waiver form. Detective Abbott twice told Bruck that the rights were "just a formality" before passing him the written form. Ex. 3. Without reading the form, Bruck signed it, but on the incorrect line; instead, he signed on the line for an adult guardian to waive a juvenile's rights. During the third interview, Bruck largely paralleled what he said toward the end of the second interview about hitting Hayden on the head with the palm of his hand, but contended he did not do so on purpose. He explained that Hayden began having seizures about an hour or hour-and-a-half after the incident, at which time he called 911. Bruck denied ever having abused or hit Hayden any other time. At the conclusion of the interview, Bruck was arrested.

[16] Hayden died on January 8, 2015. Dr. Amy Burrows-Beckham of the Kentucky Medical Examiner's office performed an autopsy on Hayden. She found that the cause of death was a closed head injury inflicted by an external blunt force. She noted the extensive brain swelling, which had caused the brain to herniate into the hole in the base of the skull and press against the brain stem. She opined that Hayden's DiGeorge Syndrome was unrelated to his death. She also believed that Hayden's injury could not have been caused by running into a door frame, nor from a fall down a household flight of stairs. Rather, it was

consistent with falling from a multiple-story building, jumping in front of a car or being in a car wreck, or having a heavy object dropped on his head. She believed a forceful blow to Hayden's head with a hand could be sufficient to have caused the injury.

[17] On January 7, 2015, the State charged Bruck with Level 3 felony aggravated battery. After Hayden died, the State amended the information to one count of Level 1 felony aggravated battery causing death to a child and one count of Level 1 felony neglect of a dependent causing death to a child. Bruck filed a pre-trial motion to suppress all three of his interviews with police, claiming that he was in custody for the first two and had to be Mirandized and that the third interview was the result of an improper "question first-warn later" interrogation method. After conducting a hearing, the trial court denied Bruck's motion to suppress.

[18] A jury trial began on September 23, 2016. At the conclusion of the presentation of evidence on that day, Bruck moved for $5000 in public funds to hire an expert witness, a pediatric neurologist, to rebut expert opinions "introduced during depositions in this matter." Tr. Vol. II p. 133. The State objected to this request, noting that the case had been pending for eighteen months and that Bruck could have moved for such funds at an earlier date. Bruck responded in part, "right now we're simply looking to hire a doctor to evaluate the evidence to determine whether there might be a rebuttal to the opinions that we received in deposition." *Id.* at 138-39. The trial court denied Bruck's motion.

[19]     At trial, in addition to the medical professionals who had personally treated or examined Hayden, the State sought to introduce the testimony of Dr. Melissa Currie, a specialist in child abuse medicine at the University of Louisville. At the outset, Bruck objected to her testimony, stating in part, "I'd just like to create the record that that was ruled upon and granted that we're not going to have testimony about what a person was told about what Mr. Bruck said, and I think that that would preclude conclusions based on that as well." Tr. Vol. III p. 53.[3] The trial court overruled this objection. During Dr. Currie's testimony, Bruck objected several times to her stating opinions based on statements made by Bruck, based on lack of foundation. The trial court overruled these objections.

[20]     Dr. Currie testified that Bruck's death was caused not only by bleeding causing external pressure on the brain and swelling but also bleeding within the brain itself. She stated that Hayden's head injury was inconsistent either with him walking into a door frame or falling down three to four steps. She did believe that a strike to Hayden's forehead with a bare palm could have caused the injury if done with enough force and that the bruise on the right side of Hayden's forehead was consistent with such a strike. She clarified that the injury would have been sustained by the hand striking, not Hayden falling back onto the floor. She also stated that Hayden's injury "was one of the worst brain

---

[3] Bruck also objected to the fact that, in Dr. Currie's written report, she referred to Hayden standing on a bed when Bruck hit him, although there is no evidence that Hayden was standing on a bed. Dr. Currie testified that her opinions were unchanged based on Hayden standing on the floor when he was struck.

injuries I've seen as far as the amount of disruption inside his brain tissue, how deep it went, how many different places it was there." *Id.* at 80. As with other doctors, she compared Hayden's injury to ones sustained in a car crash. She also opined that even a one-hour delay by Bruck in calling 911 after striking him in the head decreased Hayden's survival chances, and the first hour after sustaining head trauma is the most important for treatment.

[21] On October 3, 2016, the jury found Bruck guilty of both counts as charged. At the sentencing hearing, the trial court stated that it was finding as aggravating circumstances Hayden's age, the fact that he had a disability, and that there were other children present at the time of the offense. It found one mitigating circumstance, Bruck's lack of criminal history. The trial court entered judgment of conviction for Level 1 felony aggravated battery but reduced the neglect of a dependent count to a Level 6 felony due to apparent double jeopardy concerns. It imposed sentence of forty years for the aggravated battery conviction and two-and-a-half years for the neglect conviction, to be served consecutively for an aggregate term of forty-two-and-a-half years. Bruck now appeals.

# Analysis

## I. Admission of Statements to Police

[22] The first issue Bruck raises is whether his three statements to police should have been suppressed due to violations of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Although Bruck initially raised this issue through a pre-trial

motion to suppress, he did not seek an interlocutory appeal from the denial of that motion but did object to introduction of the statements into evidence at trial. Thus, this issue is more appropriately framed as whether the trial court properly admitted evidence at trial, not whether it properly denied the motion to suppress. *See Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). The admission of evidence at trial is a matter within the trial court's discretion. *Id.* at 259-60. "We review these determinations for abuse of that discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Id.* When there has been both a motion to suppress and a trial objection to evidence, the trial court's ultimate ruling on admissibility should be based primarily upon evidence and testimony presented at trial. *Id.* at 259 n.9. However, the trial court may also consider evidence from a motion to suppress hearing that does not directly conflict with foundational evidence presented at trial. *Id.* Also, courts should consider evidence from a motion to suppress hearing that is favorable to the defendant and not contradicted by foundational evidence offered by the State at trial. *Id.*

[23] Of the three interviews Bruck had with police, the second one is the most critical. Bruck did not make any inculpatory admissions in the first statement. The third, Mirandized statement largely duplicated the un-Mirandized second statement, as far as Bruck admitting that he had struck Hayden on the forehead an hour or so before he started having seizures. If the second statement was improperly taken, then there are potential problems with the third statement,

despite Bruck's having been Mirandized, because of the holding in *Missouri v. Siebert*, 542 U.S. 600, 124 S. Ct. 2601 (2004); that case disapproved of the police tactic of questioning a suspect in a custodial setting without giving *Miranda* warnings, then giving such warnings only after a suspect has confessed and having the suspect repeat that confession. Thus, we will focus here primarily upon Bruck's second interview at Kosair and whether *Miranda* warnings were required before that interrogation.

[24] In *Miranda*, the Supreme Court established that if law enforcement officers question a person who is in "custody or otherwise deprived of his action in any significant way," the person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of attorney, either retained or appointed." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. *Miranda* warnings are not required if a person being interrogated is not in custody. *Luna v. State*, 788 N.E.2d 832, 834 (Ind. 2003). The ultimate inquiry in determining whether a suspect is in custody is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977)). This requirement is met if a reasonable person in similar circumstances would believe he or she is not free to leave. *Luna*, 788 N.E.2d 832, 833 (Ind. 2003). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has

occurred." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)). The mere fact that questioning takes place in a "coercive atmosphere" or that police "aggressively" interrogate a suspect does not necessarily place the suspect "in custody." *Luna*, 788 N.E.2d at 834 (quoting *Mathiason*, 429 U.S. at 495, 97 S. Ct. at 714). In making a custody determination, courts must consider the totality of the circumstances, and the subjective knowledge and beliefs of an officer are irrelevant unless those thoughts are conveyed, through actions or words, to the person being questioned. *State v. Hicks*, 882 N.E.2d 238, 241 (Ind. Ct. App. 2008).

[25] This case bears some similarities to *Morales v. State*, 749 N.E.2d 1260 (Ind. Ct. App. 2001). In that case, after a young child was brought by her mother to a hospital with burns, a doctor suspected abuse and contacted law enforcement. When a police officer arrived at the hospital, he asked the mother to accompany him to the hospital chapel so he could talk to her about the child's injuries. The mother voluntarily agreed to do so, and after a twenty to thirty minute interrogation, the mother returned to her child's bedside. We held that the mother was not in custody during the interrogation in the hospital chapel and, therefore, *Miranda* warnings were not required. *Morales*, 749 N.E.2d at 1265. Although no one had expressly told the mother that she was free to leave, we found "nothing in the record to suggest that a reasonable person would not have felt free to leave under the circumstances." *Id.*

[26] There are some differences in Bruck's case that must be acknowledged. First, while the mother in *Morales* apparently had her own transportation to and from the hospital, Bruck did not. Instead, he relied on Trooper Smith to drive him from Scott Hospital to Kosair, and he had no way of immediately leaving Kosair once he got there. However, we cannot say Bruck's lack of personal motorized transportation rendered him in custody. In the context of all the facts and circumstances, Trooper Smith's driving Bruck to Kosair was a courtesy that would have been offered to any parent in such a situation. Bruck was not driven to Kosair as a suspect; rather, he sat in the front seat of Trooper Smith's cruiser, was not restrained, and engaged in general conversation with Trooper Smith unrelated to Hayden's situation.

[27] After arriving at Kosair, Detective Abbott asked to speak with Bruck, and he readily agreed. They went to a hospital-arranged private conference room of some kind. It was in a non-public area of the hospital, but many parts of a hospital are, and there is no indication that it was secured in a manner similar to a police station. Although recollections of the room vary, at worst, it was similar to a conference room in an office building—with a large table surrounded by a number of chairs. It does not appear to have been comparable to an interrogation room at a police station.

[28] At the conclusion of this first interview, Detective Abbott twice suggested that Bruck should "stick around" because of Hayden's condition and because "[w]e might need to talk to you again afterwards . . . ." Tr. Vol. I p. 94. Detective Abbott's suggestion that Bruck "stick around" can be seen two ways: one, as a

suggestion that would be given to any parent whose child was in critical condition, and two, as a hope that Bruck would be available in the event she wanted to question him some more. It was not a demand or an order that Bruck stay at the hospital.

[29] During Bruck's time at Kosair between the first and second interviews, none of the detectives or troopers there kept track of his whereabouts. Although it appears Bruck may have stayed in the conference room most of that time, he did so of his own volition. When he did leave the room to look for a restroom, no one demanded that he go back to the conference room. Troopers Smith and Yaeger were present at Kosair during both interrogations, but they were not guarding the conference room door. Also, during the first interview, Bruck had said nothing incriminating and so had no reason to think he was a suspect.

[30] When Bruck was asked to talk a second time, he readily agreed. There is no evidence he was threatened or coerced into doing so. During the second interview, Detective Mitchell did become much more aggressive in his questioning than Detective Abbott had been during the first interview, but that did not turn the interview into a custodial situation. Bruck also contends that he has mild mental retardation that affected his perception of the circumstances. However, neither Detective Abbott nor Detective Mitchell had any awareness of a mental deficiency, nor did they notice Bruck having any difficulties understanding anything, or that he appeared to be under the influence of any substances. Bruck also did not present evidence of the extent of any mental disability. Bruck's claim of mental deficiency is irrelevant to his *Miranda*

claims. *See Faris v. State*, 901 N.E.2d 1123, 1127 (Ind. Ct. App. 2009) (holding defendant's well-documented moderate mental retardation did not render noncustodial statement to police involuntary, where officers were unaware of and did not notice any mental deficiencies during questioning), *trans. denied*. After the end of the second interview, there was some subterfuge involved in driving Bruck back to the Sellersburg ISP post. By then, however, he had already made incriminating statements, and he would have been arrested immediately if Detectives Abbott and Mitchell had arrest powers in Kentucky. Alternatively, he would have been arrested after returning to Indiana, regardless of how he got there.

[31]  We recognize that a suspect's subjective thoughts are not dispositive on the question of custody. *Hicks*, 882 N.E.2d at 241. However, we do believe Bruck's own testimony at the motion to suppress hearing is telling. He testified that he voluntarily went to the conference room for the first interview, with no coercion, and that no one told him to stay in the room after the first interview was over. Also, no one came into the room or guarded the door, and Bruck admitted that he could have gotten up and walked out the door. Bruck testified that he voluntarily stayed at the hospital between the first and second interviews, that he wanted to stay updated on Hayden's status, and that no one forced him to stay there. Bruck also said he was fully willing to give a second statement, and that no one told him he had to do so or that he had to stay in the room. Again, he admitted that he could have gotten up and left the room during the second interview or left the hospital at the end of it. This testimony,

combined with the objective circumstances, leads us to readily conclude that Bruck was not in custody when he gave the second interview, even if the atmosphere became confrontational during that interview. Thus, he did not have to be Mirandized before or during that interview. Because that second statement was properly obtained and is consistent with his third, Mirandized statement, we need not address that third statement.[4] The trial court properly denied Bruck's motion to suppress and admitted his police statements into evidence.

## II. Corpus Delicti

[32] Next, we address Bruck's claim that his statements to police were inadmissible on the alternative ground that the State failed to establish a sufficient corpus delicti for their admission. Our supreme court recently described the corpus delicit rule as follows:

> In Indiana, a person may not be convicted of a crime based solely on a nonjudicial confession of guilt. Rather, independent proof of the corpus delicti is required before the defendant may be convicted upon a nonjudicial confession. Proof of the corpus delicti means "proof that the specific crime charged has actually been committed by someone." Thus, admission of a confession requires some independent evidence of commission of the crime charged. The independent evidence need not prove that a crime was committed beyond a reasonable doubt, but merely provide

---

[4] We do take a moment, however, to strongly advise against police officers telling a suspect who is in custody that a waiver of his or her *Miranda* rights is a mere "formality," as Detective Abbott told Bruck. A suspect's constitutional rights and any waiver thereof should never be taken lightly.

an inference that the crime charged was committed. This inference may be created by circumstantial evidence.

*Shinnock v. State*, 76 N.E.3d 841, 843 (Ind. 2017) (quoting *Walker v. State*, 249 Ind. 551, 559, 233 N.E.2d 483, 488 (1968)) (other citations omitted).

[33] The crux of Bruck's argument is that there is no independent evidence that he committed these offenses, aside from his extrajudicial police statements. This confuses the corpus delicti rule for the admission of confessions, as opposed to the rule for sufficient evidence to support a conviction. *See id.* at 844. Under the corpus delicti rule for the admission of confessions, there need only be evidence that the charged crime was committed by *someone*, not that the defendant committed the crime. *See Walker*, 249 Ind. at 559, 233 N.E.2d at 488; *Messel v. State*, 176 Ind. 214, 217, 95 N.E. 565, 566 (1911). Where there has been a death, a sufficient corpus delicti that the death was the result of a crime may be established by evidence that the dead body had marks of violence, or the surrounding circumstances indicate the deceased did not die from natural causes. *Jones v. State*, 253 Ind. 235, 246, 252 N.E.2d 572, 578 (1969) (quoting *Brown v. State*, 239 Ind. 184, 190, 154 N.E.2d 720, 722 (1958), *cert. denied*), *cert. denied*.

[34] Here, five medical doctors opined that Hayden's severe subdural hematoma, eventually leading to his death, was the result of trauma. Those doctors were specialists in emergency medicine, pediatric neurosurgery, pathology, and child abuse. Several doctors compared his injury to ones sustained in a car crash or a multi-story fall. However, there was no evidence of Hayden having been in

such a crash or taking such a fall. Several doctors also discounted the possibility that his death could have been the result of natural causes or something more minor, such as falling down a few steps. Thus, an inference clearly could have been made that Hayden's death was the result of a battery— a strike on his head—committed by someone. As such, a sufficient corpus delicti was established to allow the admission of Bruck's confession that he was the someone who struck Hayden in the head.

### III. *Admission of Dr. Currie's Testimony*

[35] Bruck also challenges the admission of Dr. Currie's testimony and accompanying written report, giving her opinion that Hayden's subdural hematoma and death could have been caused by a strike to the head if committed with sufficient force. We first note that it is unclear Dr. Currie's testimony and report, even if erroneously admitted, would be reversible error. The erroneous admission of evidence is harmless if was unlikely to have had a substantial impact upon the jury in light of all the other, properly-presented evidence. *Williams v. State*, 43 N.E.3d 578, 583 (Ind. 2015). Generally, the erroneous admission of evidence that is cumulative of other evidence does not constitute reversible error. *Hoglund v. State*, 962 N.E.2d 1230, 1240 (Ind. 2012). Here, four other expert witnesses, medical doctors besides Dr. Currie, gave their opinions regarding the nature and cause of Hayden's injury and resulting death. Bruck does not challenge the admissibility of any of their testimony. Drs. Gump and Burrows-Beckham, in particular, gave very detailed testimony

regarding the cause of Hayden's death. Dr. Currie's testimony was largely cumulative of theirs.

[36] In any event, Bruck's challenge to Dr. Currie's testimony circles back to his unsuccessful corpus delicti argument. Bruck does not challenge Dr. Currie's qualifications as an expert witness, but he does contest her reliance upon Bruck's police statements describing how he struck Hayden in the head in stating an opinion on whether such action could have caused Hayden's injury and death. Under Indiana Evidence Rule 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." Bruck contends that, because a corpus delicti was lacking, Dr. Currie could not rely on his police statements. But, as we discussed, there is ample evidence of a sufficient corpus delicti to permit the admission of those statements. Thus, there was no bar to Dr. Currie relying upon those statements.

### IV. Public Funds to Hire Expert Witness

[37] Bruck next contends that the trial court erred in denying his request for $5000 in public funds to hire an expert witness of his own to counter the State's experts. The decision of whether to approve the expenditure of public funds to hire an expert witness for an indigent defendant is within the trial court's discretion. *Griffith v. State*, 59 N.E.3d 947, 956 (Ind. 2016). A defendant is not entitled to any and all experts he may wish to have and bears the burden of demonstrating

a need for such a witness. *Id.* Factors a trial court may consider in deciding whether to allow the hiring of an expert at public expense include:

> (1) whether the services would bear on an issue generally regarded to be within the common experience of the average person, or on one for which an expert opinion would be necessary; (2) whether the requested expert services could nonetheless be performed by counsel; (3) whether the proposed expert could demonstrate that which the defendant desires from the expert; (4) whether the purpose for the expert appears to be only exploratory; (5) whether the expert services will go toward answering a substantial question in the case or simply an ancillary one; (6) the seriousness of the charge; (7) whether the State is relying upon an expert and expending substantial resources on the case; (8) whether a defendant with monetary resources would choose to hire such an expert; (9) the costs of the expert services; (10) the timeliness of the request for the expert and whether it was made in good faith; and (11) whether there is cumulative evidence of the defendant's guilt.

*Kocielko v. State*, 938 N.E.2d 243, 254-55 (Ind. Ct. App. 2010), *aff'd in relevant part on reh'g*, 943 N.E.2d 1282 (Ind. Ct. App. 2011), *trans. denied*. Even if certain factors would weigh in favor of hiring of an expert, the factors as a whole may be insufficient to require doing so. *Id.* at 255.

[38] Certain of the above factors weigh strongly in favor of granting Bruck's request, such as the medical issues being outside the expertise of the average person, the seriousness of the charges, and the substantial question in this case of the cause of Hayden's death. Certain other factors, however, weigh against granting the request. First, Bruck failed to establish that he wished to hire an expert for anything other than "exploratory" purposes. As counsel represented to the trial

court when making the motion, "right now we're simply looking to hire a doctor to evaluate the evidence to determine whether there *might be* a rebuttal to the opinions that we received in deposition." Tr. Vol. II at 138-39 (emphasis added). Second, it appears from the record that defense counsel was able to thoroughly cross-examine the State's expert witnesses without the benefit of having an opposing expert witness; he questioned the doctors at length about possible other causes of Hayden's injuries, including a link to his DiGeorge Syndrome. Finally, we cannot ignore that Bruck did not make this request until the end of the first day of trial. Our supreme court has clearly stated, "[a] court need not appoint an expert *if the defendant's request is untimely* or not made in good faith." *Scott v. State*, 593 N.E.2d 198, 201 (Ind. 1992). It is difficult to fathom why Bruck could not have made this request at an earlier time, in a case that had been pending for over a year-and-a-half, and in which it should have been clear from the outset that medical evidence as to the cause of Hayden's injury and death would be key to the State's case. As such, although this is a case in which an expert might have been appointed, it was not abuse of discretion for the trial court to deny Bruck's request for public funds to hire one. The request was untimely.

## V. Sentence

[39] Finally, Bruck challenges the propriety of his forty-two-and-a-half-year sentence. Although Bruck invokes Indiana Appellate Rule 7(B), his entire argument is based on claims that the trial court overlooked mitigating circumstances and relied upon improper aggravating circumstances. This is an

abuse of discretion claim, not an inappropriate sentence claim. *See Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *aff'd on r'hg*, 875 N.E.2d 218 (Ind. 2007). Abuse of discretion and inappropriate sentence claims are to be analyzed separately; Bruck fails to make a cogent argument regarding whether his sentence is inappropriate and so he has waived review of that issue.[5] *See Keller v. State*, 987 N.E.2d 1099, 1121 n.11 (Ind. Ct. App. 2013), *trans. denied*. An abuse of discretion in identifying or not identifying aggravators and mitigators occurs if it is "'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Anglemyer*, 868 N.E.2d at 490 (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)).

[40]     One of the alleged mitigating circumstances Bruck claims the trial court overlooked is a conclusion by the probation department, based on the Indiana Risk Assessment System ("IRAS"), that he was at a low risk to reoffend. However, "[e]vidence-based offender assessment scores are not to be considered aggravating or mitigating factors to determine the gross length of a sentence." *Williams v. State*, 997 N.E.2d 1154, 1165 (Ind. Ct. App. 2013) (citing *Malenchik v. State*, 928 N.E.2d 564, 575 (Ind. 2010)).[6]

---

[5] Bruck's reply brief contains slightly more argument with respect to Rule 7(B), but a party cannot raise new issues in a reply brief. *See Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011).

[6] Such tests and their scores may be used when determining the manner in which a sentence is to be served. *Williams*, 997 N.E.2d at 1165.

Bruck also argues that the trial court should have found as mitigating that imprisonment would result in a hardship to his other dependents. Trial courts are not required to find a defendant's incarceration would result in undue hardship on his dependents. *Weaver v. State*, 845 N.E.2d 1066, 1074 (Ind. Ct. App. 2006), *trans. denied*. "[T]his mitigator can properly be assigned no weight when the defendant fails to show why incarceration for a particular term will cause more hardship than incarceration for a shorter term." *Id.* Here, Bruck was facing a minimum sentence of twenty years for his Level 1 felony conviction and an advisory term of thirty years. *See* Ind. Code 35-50-2-4(b). In terms of hardship to Bruck's dependents, there is not a significant difference between a term of twenty and forty years. The trial court did not abuse its discretion in failing to recognize this factor as a mitigating circumstance.

Bruck also suggests that his alleged mental disability should have been considered by the trial court. A trial court does not have to accept a defendant's claim of mental disability where the evidence regarding it is highly disputable in nature, weight, or significance. *Smith v. State*, 670 N.E.2d 7, 8 (Ind. 1996). Also, in order for a defendant's mental history to be mitigating, "there must be a nexus between the defendant's mental health and the crime in question." *Steinberg v. State*, 941 N.E.2d 515, 534 (Ind. Ct. App. 2011), *trans. denied*. There is scant evidence in the record regarding the extent of Bruck's alleged mental retardation or whether it had any nexus to the offenses here. He apparently dropped out of school in the 11th grade and was diagnosed as "mildly mentally retarded" at age eighteen. App. p. 40. We cannot say this small bit of

information required the trial court to find Bruck's mental health to be a mitigating circumstance.[7]

Finally, Bruck contends the trial court erred in finding Hayden's age to be an aggravating circumstance. He notes that the age of the victim is an element of the offense of Level 1 aggravated battery resulting in the death of a child. *See* I.C. § 35-42-2-1.5 (making aggravated battery a Level 1 felony if the victim is less than fourteen and the defendant is at least eighteen). However, the young age of a victim may be considered an aggravating circumstance where the victim is well below the age that is an element of the offense. *See Kien v. State*, 782 N.E.2d 398, 414 (Ind. Ct. App. 2003) (holding trial court properly considered four-year-old molestation victim's young age as an aggravating circumstance), *trans. denied*. The trial court did not abuse its discretion in considering Hayden's age as an aggravating circumstance as it was well below the fourteen-year-old threshold for Level 1 felony aggravated battery resulting in the death of a child.

## Conclusion

Bruck was not in custody when he gave his critical, inculpatory second statement to police and, therefore, he did not have to be given *Miranda* warnings beforehand. The trial court properly admitted his police statements

---

[7] Bruck also suggests his mental retardation could have been related to a brain injury of some kind, but he directs us to no evidence in the record to support such a claim.

into evidence. There also was a sufficient corpus delicti to support introduction of those statements into evidence and to serve as a basis for Dr. Currie's expert opinions. The trial court did not abuse its discretion in denying Bruck's request for public funds to hire an expert witness, and it also did not abuse its discretion in sentencing Bruck. We affirm in all respects.

[45] Affirmed.

May, J., and Bradford, J., concur.